T.C. Memo. 2012-330

UNITED STATES TAX COURT

LINDA J. ROMANO-MURPHY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27236-09L.                    Filed November 29, 2012.

Linda J. Romano-Murphy, pro se.

<u>Kimberly A. Daigle</u>, for respondent.

CONTENTS

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

1.    Formation and Operation of Nurses PRN, LLC (i.e. NPRN) . . . . . . . . . . . . 6

2.    The Timing of NPRN's Deposits of Its Employment Taxes . . . . . . . . . . . . 10

3.    NPRN's Payments of Employment Taxes Before First Quarter 2005
      (Including Alleged Overpayments for Fourth Quarter 2003 and Fourth
      Quarter 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**[\*2]** 4. NPRN's Temporary Merger With Nurses Staffing, LLC,
in June 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

5. NPRN's August 2004 Negotiations With PRN Health Services, Inc. . . . . . 16

6. December 2004 Letter of Intent From Medical Staffing Solutions, Inc.
(i.e. MSSI) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

7. NPRN's January 2005 Securities Exchange Agreement With MSSI . . . . . 20

8. Alleged Overpayment of NPRN's Taxes for First Quarter 2005 . . . . . . . 20

9. NPRN's Employment-Tax Liability for Second Quarter 2005 as
Subdivided Into the Three Categories of Employment Taxes . . . . . . . . . . . 20

10. NPRN's Semiweekly Deposits for Second Quarter 2005 . . . . . . . . . . . . . 24

11. NPRN's June 16, 2005 Asset-Purchase Agreement With MSSI and
Nurses PRN Acquisition Corp. (i.e., NAC) . . . . . . . . . . . . . . . . . . . . . . 25

12. Completion of the Sale of Assets to MSSI . . . . . . . . . . . . . . . . . . . . . . . 36

13. The Agreement Between NPRN and the IRS Regarding the
Application of the $1.6 Million Payment . . . . . . . . . . . . . . . . . . . . . . . . . 36

14. The Alleged Letter to Gary Greene Regarding the Application of the
$1.6 Million Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

15. The Application of the $1.6 Million Payment by the IRS . . . . . . . . . . . . . 38

16. Whether the IRS's Application of $740,712.89 of the $1.6 Million
Payment Caused a Tax Overpayment for First Quarter 2004 . . . . . . . . . . . 42

17. The Form 941 for Second Quarter 2005 . . . . . . . . . . . . . . . . . . . . . . . . . 43

18. Romano-Murphy's Awareness of NPRN's Employment-Tax Liability
for Second Quarter 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

**[*3]** 19.    NAC Begins Operations; Renamed NOC  . . . . . . . . . . . . . . . . . . . . 44

20.    The $70,000 of Payments by NOC of NPRN's Taxes That Were
       Applied by the IRS Against Fourth Quarter 2003, First Quarter 2004,
       and Second Quarter 2004  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

21.    After 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

OPINION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

I.     Applicable Legal Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

       A.    Collection-Review Hearing  . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

       B.    An Employer's Liability for Employment Taxes and FUTA
             Taxes  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

II.    The Unpaid Amount of NPRN's Trust-Fund Taxes for Second Quarter
       2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

       A.    Application of the $189,316.63 in Semiweekly Deposits . . . . . . . . . 71

       B.    Application of the $73,783.00 Payment . . . . . . . . . . . . . . . . . . . . 81

       C.    Application of the Supposed $17,866.99 Overpayment From
             First Quarter 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

       D.    The $70,000 in Payments by NOC That Were Applied by the
             IRS Against Tax Liabilities for Fourth Quarter 2003, First
             Quarter 2004, and Second Quarter 2004  . . . . . . . . . . . . . . . . . . . 86

       E.    Alleged Overpayments of $12,009.07 From Fourth Quarter
             2003, Fourth Quarter 2004, and First Quarter 2005 . . . . . . . . . . . . 86

III.   Romano-Murphy Is a Responsible Person Under Section 6672 . . . . . . . . . 87

IV.    Willfulness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

**[*4]** A.    Romano-Murphy Acted Willfully in Refusing To Pay Trust-Fund Taxes to the Federal Government ......................... 91

B.    Romano-Murphy Did Not Make Reasonable Efforts To Pay NPRN's Unpaid Trust-Fund Taxes ........................ 98

     1.    NPRN's June 2004 Temporary Merger With Nurses Staffing, LLC, and Its August 2004 Negotiations With PRN Health Services, Inc. ........................... 98

     2.    The Alleged Assumption by NAC of NPRN's Second Quarter 2005 Trust-Fund-Tax Liability ................. 99

     3.    Whether Romano-Murphy's Refusal To Pay the Trust-Fund Taxes Was Justified by the Subsequent Payment of $1.6 Million ...................................... 102

     4.    Romano-Murphy's Efforts To Sell NOC's Assets in 2006 .. 103

     5.    Romano-Murphy's Filing of a Proof of Claim in the Bankruptcy of MSSI ............................... 104

     6.    Accurate Reporting and Cooperation With the IRS ....... 105

C.    Alleged Errors Made by the Appeals Office Regarding Willfulness ....................................... 106

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>: Linda J. Romano-Murphy petitioned the Court under section 6330(d)(1) to review the determination of the IRS Appeals Office

[*5] sustaining a proposed levy and filing of notice of federal tax lien to collect a section 6672 penalty assessed against her. Unless otherwise indicated, all references to sections are to the Internal Revenue Code of 1986, as amended. The issue for decision is whether Ms. Romano-Murphy is liable for penalties assessed against her for failing to pay over the income taxes and Federal Insurance Contribution Act (FICA) taxes that were withheld from the wages of employees of Nurses PRN, LLC, for the second quarter of 2005.

## FINDINGS OF FACT[1]

The parties entered into a stipulation of facts, which was supplemented twice. We adopt the stipulation of facts, as supplemented, as our findings of fact unless otherwise noted.

For the convenience of the reader, we note below abbreviations that are used for some of the entities relevant to this dispute:

---

[1]This report, see sec. 7459(a), is divided into subdivisions of FINDINGS OF FACT and OPINION. However, the FINDINGS OF FACT contain not only findings of fact but also some of the reasoning underlying some of the findings of fact. Also, some findings of fact are set forth in the OPINION rather than the FINDINGS OF FACT. These are generally (1) findings of fact that synthesize or depend on other findings of fact or (2) findings of fact that are more easily explained in conjunction with the applicable legal standards governing the resolution of this case.

| [*6] | Table of abbreviations |
|---|---|
| Abbreviation | Entity |
| NPRN | Nurses PRN, LLC |
| Webbank | Webbank/Rockland Credit Finance, LLC |
| MSSI | Medical Staffing Solutions, Inc. |
| NAC | Nurses PRN Acquisition Corp. |
| NOC | Nurses Onsite Corp. |

1.    Formation and Operation of Nurses PRN, LLC (i.e. NPRN)

Nurses PRN, LLC, was formed in July 2002 by three persons: Aftab Adamjee, Robert Murphy, and Linda J. Romano-Murphy. Linda J. Romano-Murphy was known as Linda J. Romano until June 2005, when she married Robert Murphy. We refer to her as Romano-Murphy. We refer to Nurses PRN, LLC, as NPRN.

NPRN was in the business of health-care staffing. It employed nurses and arranged for them to work at hospitals that wished to hire nurses as needed rather than permanently. The hospitals would remit payment (to NPRN's factor, as discussed below) for the nurses' services. NPRN paid wages to the nurses.

NPRN offered the nurses the option of receiving their wages immediately after the end of each work shift. Without a factoring arrangement, this method of payment would have posed a potential timing problem for NPRN because it would

**[\*7]** have had to make its wage payments to the nurses before it received its own fees from the client hospitals. To match the timing of its cashflows to the timing of its wage payments, NPRN had a factoring arrangement with its factor, Webbank/ Rockland Credit Finance, LLC ("Webbank"). The arrangement worked as follows: Whenever NPRN billed a hospital for services, Webbank would advance to NPRN 90% of the amount billed. Webbank deposited the advances into NPRN's bank account at Suntrust Bank. The parties stipulated that this was the only bank account used by NPRN. With the money in the bank account, NPRN would make wage payments to the nurses. The wage payments took into account the requisite federal trust-fund taxes, meaning that the wage payments were reduced by NPRN to reflect that it was withholding (1) employees' income taxes and (2) the employees' share of FICA taxes. Later, when a hospital paid its bill, it would make its payment to Webbank rather than NPRN. When Webbank received the payment from the hospital, it would deposit in NPRN's bank account an amount equal to (a) 10% of the payment it received from the hospital, minus (b) Webbank's fee.

In 2005 NPRN had 10 staffing locations in 6 states and provided medical staffing services to over 250 clients. It employed over 1,000 nurses and 25

[*8] administrative and management staff.  The company was based in West Palm Beach, Florida.

From the time it was formed in July 2002 until its corporate assets were sold on July 1, 2005, NPRN's stock ownership was as follows:

| | |
|---|---|
| Aftab Adamjee | 50% |
| Robert Murphy | 25% |
| Linda J. Romano-Murphy | 25% |

Aftab Adamjee had provided $1 million in funding to the company.

Robert Murphy was the chief executive officer and president of NPRN from July 2002 through June 30, 2005.

Romano-Murphy was the chief operating officer and secretary of NPRN from July 2002 through June 30, 2005.  As the parties have stipulated, Romano-Murphy's job was to manage "all the branches" of NPRN and to manage "the Payroll, Accounting, and Accounts Receivable Departments" of NPRN.  She "controlled NPRN's finances, wrote and signed checks to creditors, and signed all federal income and employment tax returns for NPRN."  The record contains copies of 164 checks that the parties stipulated are "checks issued on NPRN's bank account at Suntrust Bank * * * during the period from April 1, 2005 through June 16, 2005."  All 164 checks bear Romano-Murphy's signature (either an original or a stamp).  The record also contains copies of 68 checks that the parties

[*9] stipulated are "checks issued on NPRN's bank account at Suntrust Bank * * * during the period from May 2, 2005 through June 30, 2005." All 68 checks bear Romano-Murphy's signature (either an original or a stamp). None of the checks in the first group of 164 are also in the second group of 68.

The parties have stipulated that Romano-Murphy "was paid a salary during the period from January 1, 2005 through June 30, 2005 at a rate of $120,000 per annum." On brief, Romano-Murphy objects to the Court's adopting this statement as a finding of fact. She contends that for the second quarter of 2005, she received only $4,615.38 in salary, which is far less than the $30,000 she would have received for the quarter if she had been paid at a $120,000 annual rate. A party is not permitted to contradict a stipulation, except where justice so requires. Tax Ct. R. Pract. & Proc. 91(e). The trial record contains evidence of only $4,615.38 in salary payments to Romano-Murphy during the second quarter of 2005. It is apparent, however, that not all of NPRN's payments are reflected in the trial record. Had the IRS known that Romano-Murphy would deny receiving the amount of salary that she stipulated to have received, the IRS might have introduced evidence at trial to show that Romano-Murphy received a salary at a

**[*10]** $120,000 annual rate. To permit Romano-Murphy to contradict the stipulation would unfairly prejudice the IRS. Furthermore, the stipulated statement is not contrary to the record. Therefore, we adopt the stipulated statement in question.

2.    The Timing of NPRN's Deposits of Its Employment Taxes

Employers are required to make deposits of their employment taxes. See infra part I.B. The term "employment taxes" as used here refers to (1) the employer share of FICA tax (which we refer to as the "employer share of FICA"), (2) the employer's obligation to withhold the employee share of FICA tax (which we refer to as "employee FICA withholding"), and (3) the employer's obligation to withhold the employee's income tax (which we refer to as "income-tax withholding"). The term does not refer to an employer's obligation to pay its federal unemployment tax liability.

Employment taxes must generally be deposited in an authorized financial institution by employers. See infra part I.B. Each employer who is required to make deposits of employment taxes is classified by regulation either as a monthly depositor or a semiweekly depositor. See infra part I.B. A monthly depositor must make deposits monthly. A semiweekly depositor must make deposits semiweekly. The parties have stipulated that "Employment taxes withheld by

[*11] NPRN were to be deposited on a semiweekly basis with a financial institution that is an authorized depository for federal taxes." The stipulation means that NPRN was required to make semiweekly deposits of employee FICA withholding and income-tax withholding. These types of taxes are "withheld"--the word used by the parties in the stipulation. As to the employer share of FICA, which is not withheld, the stipulation is seemingly silent as to whether NPRN was a semiweekly or a monthly depositor. We conclude that NPRN was required to deposit all three types of employment taxes semiweekly. The required frequency of deposits is the same for all three employment-tax obligations. The applicable regulation, 26 C.F.R. sec. 31.6302-1(a) (2005), states: "An employer must generally deposit employment taxes [a term defined to include all three types of employment taxes] under one of two rules: the Monthly rule * * * or the Semi-Weekly rule". Although this regulation was amended by T.D. 9239, 2006-1 C.B. 401, the amendment does not change the rule about the timing of deposits. Also, the amendment became effective on January 1, 2006, and is therefore inapplicable to deposits of taxes for the second quarter of 2005. Because all three types of employment taxes must be deposited on the same schedule (semiweekly or monthly), see 26 C.F.R. sec. 31.6302-1(a) (2005), it follows that an employer that is a semiweekly depositor for employee FICA withholding and for income-tax

[*12] withholding is also a semiweekly depositor for the employer share of FICA. This conclusion is consistent with the Form 941, Employer's Quarterly Federal Tax Return, filed by NPRN for the quarter at issue (the second quarter of 2005). The form states that NPRN is a semiweekly depositor. All three types of employment-tax liability were reported by NPRN on the Form 941. The Form 941 is designed by the IRS for the reporting of all three types of employment-tax liability. It is sometimes referred to as the quarterly employment-tax return. Thus, NPRN's Form 941 is consistent with the conclusion that NPRN was a semiweekly depositor for all three types of employment-tax liability.

NPRN used its bank account at Suntrust to pay its operating expenses, including its employment taxes.

3.  NPRN's Payments of Employment Taxes Before First Quarter 2005 (Including Alleged Overpayments for Fourth Quarter 2003 and Fourth Quarter 2004)

From its formation in 2002, NPRN experienced financial losses. It reported nearly $90,000 in losses on its 2002 income-tax return, over $1.3 million in losses on its 2003 income-tax return, over $1.2 million in losses on its 2004 income-tax return, and nearly $780,000 in losses on its 2005 income-tax return. (NPRN filed its income-tax returns as a partnership. Its annual income was therefore reported

[*13] on Form 1065, U.S. Return of Partnership Income.) NPRN fell behind in paying its employment and federal unemployment taxes.

For the fourth quarter of 2003, NPRN reported on its Form 941 that its employment-tax liability was $898,102.13. Its semiweekly deposits fell short of this liability. NPRN made additional payments against its liability for the quarter. The payments and the deposits amounted to $900,067.12, which comprised:

- $540,067.12 in deposits,

- a $75,000 payment with the return, and

- $285,000 in payments after the return was filed.

In addition to these payments and deposits of $900,067.12, the IRS recorded a $6,453.70 payment on July 23, 2005. Romano-Murphy's position is that by the time of the July 23, 2005 payment, NPRN had settled its employment-tax liability for the fourth quarter of 2003, and therefore the $6,453.70 payment should not have been applied against that quarter and should have been applied against the second quarter of 2005 instead. We explain infra part 13 why this view is incorrect. Romano-Murphy also contends that, even setting aside the $6,453.70 payment, the $900,067.12 in payments and deposits resulted in a $1,982.38 overpayment that should have been applied by the IRS against the second quarter of 2005. According to the IRS, however, Romano-Murphy underestimates

[*14] NPRN's employment-tax-related liability for the fourth quarter of 2003 because she does not include interest on the employment taxes and penalties. The IRS's view is supported by the trial record. The Form 4340, Certificate of Assessments, Payments, and Other Specified Matters, for the fourth quarter of 2003 shows, for example, that the IRS assessed a $75,203.51 federal-tax-deposit penalty against NPRN. Romano-Murphy did not account for this penalty in her calculation that there was a $1,982.38 overpayment. We conclude that there was no overpayment for the fourth quarter of 2003.

For the fourth quarter of 2004, NPRN reported an employment-tax liability of $1,224,496. Romano-Murphy contends that the payments and deposits for this quarter resulted in a $27.47 overpayment for the quarter that the IRS should have applied against the second quarter of 2005. Again, the IRS responds that her calculation does not include federal-tax-deposit penalties and interest. The IRS's views are supported by the Form 4340 for this quarter. We agree with the IRS that there was no overpayment for the fourth quarter of 2004.

Because there were no overpayments for the fourth quarter of 2003 and the fourth quarter of 2004, NPRN's employment-tax liability for the second quarter of 2005 should not be reduced by $1,982.38 and $27.47. See infra part II.E.

[*15] In December 2004, the IRS Collection Division in Deerfield Beach, Florida, initiated an investigation to collect the past-due employment taxes of NPRN for the fourth quarter of 2003, the first quarter of 2004, and the second quarter of 2004. The IRS would later file notices of lien to collect these taxes (and to collect past-due employment taxes for the third quarter of 2004). The notices are summarized in the table below:

| Federal tax liens filed against NPRN to collect employment-tax liabilities for quarters before 2Q 2005 | |
| --- | --- |
| Date of filing of federal tax lien | Employment tax quarter affected |
| Jan. 7, 2005 | 4Q 2003<br>1Q 2004 |
| Feb. 4, 2005 | 2Q 2004 |
| May 11, 2005 | 3Q 2004 |

4.    NPRN's Temporary Merger With Nurses Staffing, LLC, in June 2004

In June 2004, Romano-Murphy and Robert Murphy oversaw a temporary merger of NPRN with Nurses Staffing, LLC, which had a preexisting business relationship with NPRN. Although the details of this merger are sketchy, it appears that the merger was contingent on an additional $1 million contribution by Adamjee, the third member of NPRN. When Adamjee failed to make the required contribution, the operations of the two companies were separated.

[*16] Romano-Murphy thinks that if NPRN's merger with Nurses Staffing, LLC, had been successful, the combined company would have achieved the financial success necessary to make ongoing timely payments of its employment taxes. She thinks that NPRN lost half of its business because of the disruption caused by the failed merger, thus impairing its ability to make ongoing timely payments of its employment taxes. We need not determine whether we agree with Romano-Murphy's opinions on these matters, i.e., that a successful merger would have resulted in timely payments of employment taxes and that the failure of the merger impaired NPRN's ability to make timely payments of employment taxes. Even if Romano-Murphy is correct, our conclusions would not change.

5.     NPRN's August 2004 Negotiations With PRN Health Services, Inc.

At some time during 2004, the three members of NPRN decided to attempt to sell the company. In August 2004, they received an offer from PRN Health Services, Inc., to purchase a 60% interest in NPRN for $850,000. The stipulation states that the "offer contemplated that $750,000 of the $850,000 payment would be applied to prior payroll tax liabilities." Adamjee rejected the offer because the deal would have resulted in a payment to him of only $100,000. No deal was consummated.

**[*17]** 6.   <u>December 2004 Letter of Intent From Medical Staffing</u>
<u>Solutions, Inc. (i.e. MSSI)</u>

Toward the end of 2004, NPRN began negotiating a deal whereby its

members would sell their interests to Medical Staffing Solutions, Inc. ("MSSI").

MSSI was represented in the negotiations by its president, Dr. Brajnandan B. Sahay.

A draft letter of intent dated November 18, 2004, was presented by MSSI to NPRN.

The parties have stipulated that the draft letter was "a draft copy of a letter of intent

for MSSI to acquire NPRN."  The draft letter stated:

> Medical Staffing Solutions, Inc. ("MSSI"), would like to present
> Nurses PRN Inc. ("Nurses PRN") and the shareholders of Nurses
> PRN:  Robert Murphy, Linda Romano and Aftab Adamjee
> (collectively, the "Shareholders") with the following proposal to issue
> and deliver to the Shareholders shares of common stock of MSSI
> ("MSSI Common Stock") in exchange for all of the issued and
> outstanding common stock of Nurse PRN [sic] (the "Nurses PRN
> Common Stock").  This letter of intent ("LOI") outlines the principal
> terms of the proposed transaction; the final terms and conditions would
> be evidenced by a definitive written agreement (the "Agreement")
> acceptable to the parties.  Among other things, it is contemplated that
> the Agreement would provide for the following:
>
> 1. Cash at Closing:  At closing, MSSI will pay the Shareholders,
> collectively, $1,600,000 in cash.
>
> 2. Subsidiary Status:   Upon the closing of this transaction,
> Nurses PRN shall become a 100% wholly-owned subsidiary of MSSI.
>
> 3. Share Exchange:  The transaction contemplates that the
> Shareholders would exchange with, and deliver to MSSI, the Nurses
> PRN Common Stock, and in exchange therefore, MSSI would issue,

**[*18]** and deliver, to the Shareholders MSSI Common Stock.  The total number of shares of MSSI Common Stock to be issued to the shareholders shall have a value of $960,000.  * * *

\*       \*       \*       \*       \*       \*       \*

4.  Retained Long-Term Liabilities:  As part of this transaction, Nurses PRN, as a wholly-owned subsidiary of MSSI, will retain the following only the following debts [sic] (MSSI will not assume any debts of Nurses PRN directly):

a.  the $420,000 note payable issued to Jeff Dowling by Nurses PRN, which shall be payable solely out of Nurses PRN's cashflows.

b.  a $250,000 note payable to Aftab Adamjee by Nurses PRN, which shall be guaranteed by MSSI.  The note will be issued at closing and requires settlement of all liabilities per the current Nurses PRN approx. $1,000,000 note to Aftab Adamjee.  The note will have a 12 month term with semi-annual payments of $125,000 payable at the end of 6 months and one year.

c.  Nurses PRN will settle prior to closing all liabilities per the current Nurses PRN approx. $1,000,000 note held by Aftab Adamjee.

d. a liability on Nurses PRN balance sheet of no more than $220,000 related to current operations.

5.  Tax Liabilities. As a condition to closing, Nurses PRN must have paid in full all taxes due and owing, including the payment of tax liabilities owed to the IRS by Nurses PRN for past due liabilities, interest and penalties and all other past due taxes.

\*       \*       \*       \*       \*       \*       \*

10.  Conduct Prior to Closing:  Nurses PRN agrees that until this LOI is terminated a) Nurses PRN will not engage in <u>any</u>

**[*19]** transactions out the ordinary course of business between the date hereof and closing * * * b) the business will be operated in the normal course consistent with past practices, including with respect to all cash management practices; * * *.

* * * * * * *

15. Non-Binding Effect: This letter is only a list of the proposed principal points that may become part of an eventual Agreement between the parties and does not contain all matters on which agreement must be reached in order for a transaction to be consummated. This LOI does not constitute a binding contract and the parties do not intend to be legally bound, except as provided by the terms and conditions of the Agreement, when and if executed and delivered, and nothing stated herein expressly or by implication would impose any obligations on the parties; provided, however, that the parties to this LOI agree to be legally bound by the terms of paragraph 12 through 18.

16. Termination: This letter will expire at 5:30 PM EST on December 01, 2004 and MSSI will permanently withdraw its intention to pursue a transaction with the [NPRN] Shareholders and Nurse PRN [NPRN] unless a fully executed copy of this letter is exchanged by such time.

On December 6, 2004, MSSI and NPRN signed a letter of intent for MSSI to acquire NPRN. The record does not contain a copy of the letter of intent. Thus we do not know whether it contained the same terms as the draft letter of intent above.

**[\*20]** 7.    NPRN's January 2005 Securities Exchange Agreement
                  With MSSI

A securities exchange agreement to sell NPRN stock to MSSI was drafted in January 2005. The draft agreement was not signed. Under the terms of the draft agreement, all ownership interests in NPRN would be sold to MSSI by February 28, 2005. The parties do not contend that our findings of fact should be influenced by the existence of the draft securities exchange agreement or its terms, and therefore we do not discuss it any further.

8.    Alleged Overpayment of NPRN's Taxes for First Quarter 2005

For the first quarter of 2005, Romano-Murphy contends that NPRN made an overpayment of $9,999.22. The IRS responds that her calculations are wrong because they do not include a federal-tax-deposit penalty. The IRS's views are confirmed by the Form 4340 for this quarter. We agree with the IRS that there was no overpayment for the first quarter of 2005. Thus, as we conclude infra part II.E., NPRN's employment-tax liability for the second quarter of 2005 should not be reduced by $9,999.22.

9.    NPRN's Employment-Tax Liability for Second Quarter 2005 as
      Subdivided Into the Three Categories of Employment Taxes

Paragraph 59 of the stipulation states: "The total Form 941 employment tax liability of NPRN for the period ended June 30, 2005 was $609,832.01." An

[*21] employer's employment-tax liability is composed of three categories of taxes. Paragraph 59 of the stipulation does not reflect how NPRN's employment-tax liability is distributed among the three categories. For reasons explained below, we find that the $609,832.01 employment-tax liability is composed of the following liabilities: $206,812.50 for the employer share of FICA, $206,812.51 for employee FICA withholding, and $196,207.00 for income-tax withholding.

The IRS's view of the amounts of each type of employment-tax liability is reflected in paragraph 74 of the stipulation. Paragraph 74 of the stipulation states that the IRS determined that NPRN owed the following amounts before payments:

| Type of liability | IRS determination |
| --- | --- |
| Employer share of FICA | $206,812.50 |
| Employee FICA withholding | 206,812.51 |
| Income-tax withholding | 196,207.00 |
| Total | 609,832.01 |

Romano-Murphy's view of NPRN's employment-tax liability is seemingly set forth in paragraph 75 of the stipulation. Paragraph 75 states that Romano-Murphy "alleges" that NPRN owed the following amounts before payments:

| Type of liability | Romano-Murphy's allegation |
| --- | --- |
| Employer share of FICA | $205,811.23 |

| **[*22]** Employee FICA withholding | 205,811.23 |
|---|---|
| Income-tax withholding | 196,316.26 |
| Total | 607,938.72 |

There is an inconsistency between paragraph 75 and paragraph 59 of the stipulation. Paragraph 75 states that Romano-Murphy alleges that NPRN's employment-tax liability for the second quarter of 2005 is $607,938.72. But paragraph 59 reflects Romano-Murphy's agreement that the liability is $609,832.01, an amount that exceeds $607,938.72 by $1,893.29. The inconsistency between paragraphs 75 and 59 is resolved in Romano-Murphy's brief. In her brief, Romano-Murphy concedes that NPRN's liability for employment taxes was correctly reported by NPRN on its Form 941 for the quarter. The return reported that $413,624.58 was the combined amount of NPRN's liabilities for (1) the employer share of FICA and (2) employee FICA withholding. Because these two FICA liabilities are equal by law, see infra part II.B, each liability alone would be half of $413,624.58, or $206,812.29. The return also reported that NPRN was liable for $196,207.43 of income-tax withholding. The total employment-tax liability reported on the return--i.e., employer share of FICA, employee FICA withholding and income-tax

[*23] withholding--was $609,832.01. Thus, the following table represents the information reported on the Form 941:

| NPRN's employment-tax liability for second quarter 2005, as reported on Form 941: | |
| --- | --- |
| Type of liability | Return |
| Employer share of FICA (derived by halving the total FICA tax reported) | $206,812.29 |
| Employee FICA withholding (derived by halving the total FICA reported) | 206,812.29 |
| Income-tax withholding (as actually reported) | 196,207.43 |
| Total | 609,832.01 |

The return reported that $403,019.72 was owed in trust-fund taxes, i.e., employee FICA withholding and income-tax withholding. This is 21 cents more than the IRS's determination ($403,019.51). Because Romano-Murphy has not demonstrated that she has been or will be prejudiced by the minor 21-cent difference, we decline to consider whether to resolve this difference in Romano-Murphy's favor.

Given that (1) paragraph 75 of the stipulation conflicts with paragraph 59, (2) Romano-Murphy made the concessions in her brief described above, and (3) we decline to resolve in Romano-Murphy's favor the 21-cent difference between

**[*24]** the IRS's determination and Romano-Murphy's position on brief, we hold that NPRN's employment taxes for the second quarter of 2005 consist of the amounts asserted by the IRS: i.e., $206,812.50 for the employer share of FICA, $206,812.51 for employee FICA withholding, and $196,207.00 for income-tax withholding, for a total employment-tax liability of $609,832.01.

10.    NPRN's Semiweekly Deposits for Second Quarter 2005

NPRN's failure to remit employment taxes continued into the second quarter of 2005. For this quarter, NPRN made 11 semiweekly deposits--totaling $189,316.63--towards its employment-tax liability. The IRS applied these 11 deposits against NPRN's employment-tax liability for the quarter

An IRS internal record, a Form 4340, recorded the following information about the deposits that were applied against NPRN's employment-tax liability for the second quarter of 2005:

| Date | Amount |
| --- | --- |
| Apr. 29, 2005 | $7,842.37 |
| May 3, 2005 | 16,675.97 |
| May 11, 2005 | 19,078.28 |
| May 24, 2005 | 15,678.00 |
| May 27, 2005 | 10,000.00 |
| June 1, 2005 | 29,186.26 |

| | |
|---|---|
| [*25] June 3, 2005 | 15,832.57 |
| June 14, 2005 | 13,531.67 |
| June 15, 2005 | 20,000.00 |
| June 21, 2005 | 13,337.99 |
| June 29, 2005 | 28,153.52 |
| Total | 189,316.63 |

These deposits are also reflected on NPRN's bank statements.

NPRN made five deposits in April 2005 that were not reflected on the Form 4340 for the second quarter of 2005 because they were applied against the first quarter of 2005. These five deposits are instead reflected on the Form 4340 for the first quarter of 2005.

The trial record does not directly explain why the deposits are not at semiweekly intervals, i.e., twice per week. We surmise that NPRN failed to comply with the required semiweekly schedule.

11. NPRN's June 16, 2005 Asset-Purchase Agreement With MSSI and Nurses PRN Acquisition Corp. (i.e., NAC)

On June 16, 2005, an asset-purchase agreement was signed by the following entities: (1) NPRN, (2) MSSI, and (3) Nurses PRN Acquisition Corp. ("NAC"). Nurses PRN Acquisition Corp. is referred to in the asset-purchase agreement as

[*26] "the Purchaser", and is referred to in this opinion as NAC.  NAC is a subsidiary of MSSI.

The asset-purchase agreement imposed various obligations on the parties to the agreement.  Paragraph 1.8 required the parties to consummate all transactions contemplated by the agreement.  The consummation of the transactions was defined in the agreement as the "Closing".  Under paragraph 1.8, the date of the closing was to be no later than June 16, 2005, or "such other date as mutually agreed to by the parties".

Paragraph 1.1 of the agreement obligated NPRN to transfer all of its "assets" and "properties" to NAC at the closing.

As part of the consideration for NPRN's assets, NAC agreed to cause MSSI to issue 9,500,000 new shares of MSSI common stock to the members of NPRN. The new stock was to be distributed--and was eventually distributed--as follows:

| Recipients of newly issued MSSI common stock | |
|---|---|
| Recipient | Number of shares |
| Aftab Adamjee | -0- |
| Robert Murphy | 4,750,000 |
| Linda Romano-Murphy | 4,750,000 |

[*27] Paragraph 1.6(a) of the agreement required NAC to make a payment of $1.6 million as partial consideration for NPRN's assets.  It stated:

> In addition to the Share Consideration [i.e. the 9,500,000 newly issued shares of common stock], the Purchaser [NAC] shall pay the Company [NPRN] One Million Six Hundred Thousand Dollars ($1,600,000) in cash (the "Cash Consideration"), which shall be used to pay or satisfy its outstanding Tax Liabilities (as defined below)  and, at the direction of the Members, shall be paid directly to the Internal Revenue Service (the "IRS").
>
>         *        *        *        *        *        *        *
>
> For purposes of this Agreement, "Tax Liabilities" shall mean unsatisfied federal employment taxes for purposes of Form 941, and all interest and penalties related thereto for periods prior to June 16, 2005.

Romano-Murphy and the IRS stipulated that paragraph 1.6(a) required that:

> members of NPRN would receive * * * $1.6 million in cash which was to be paid over to the Internal Revenue Service to pay back taxes for all periods ending before June 16, 2005.
>
> Paragraph 1.4 of the asset-purchase agreement required NAC to assume

specific liabilities of NPRN referred to as "Assumed Liabilities":

> The Purchaser [NAC], after the Closing, shall assume the following debts and liabilities (collectively, the "Assumed Liabilities") (it being expressly understood by the parties to this Agreement that the Purchaser [NAC] will not assume any other debts or liabilities except for those debts or liabilities set forth below and MSSI shall not assume any debts whatsoever of the Company [NPRN]):

**[*28]** (a) a * * * $365,487.50 * * * note payable ("Dowling Note") issued to Jeff Dowling ("Dowling") by the Purchaser [NAC], which shall be payable solely out of the Purchaser's cashflows and which shall be secured by Robert Murphy ("Murphy") and Linda Romano's ("Romano") interest in 3,166,666 MSSI Shares (as defined below) ("Dowling Security Shares"), and guaranteed by MSSI to the extent the total value of the Dowling Security Shares at the Closing is less than the principal and accrued interest on the Dowling Note, in exchange for Dowling releasing the guaranty of Aftabe [sic] Adamjee ("Adamjee") with respect to the Dowling Note;

(b) a * * * $250,000 * * * note payable to Adamjee ("Adamjee") by the Company ("the "Adamjee Note"), guaranteed by MSSI, which shall be issued to Adamjee in exchange for Adamjee releasing the Company and the Purchaser from any obligations due to him under a * * * $1,000,000 * * * note payable issued by the Company to Adamjee (the "Note Payable"); and

(c) the general payables specifically set forth in Schedule 1.4 hereto.

                    *    *    *    *    *    *    *

Except for the Assumed Liabilities, the Purchaser [NAC] is not assuming any liability or obligation of the Company [NPRN] (or any predecessor owner of all or part of the Purchased Assets) and will not pay, discharge, perform or otherwise be liable for any liabilities, indebtedness or obligations which relate to the Company [NPRN] or the Purchased Assets existing on the Closing Date or arising out of any transactions entered into, or any state of facts existing, on or prior to the Closing Date (collectively, the "Excluded Liabilities"). All such Excluded Liabilities and obligations shall be retained by and remain obligations and liabilities of the Company [NPRN] or the Members, as the case may be.

**[*29]** Paragraph 1.8 of the agreement required NAC to execute an agreement "transferring" from NPRN to NAC "all responsibility for the Assumed Liabilities in a form reasonably acceptable to the Parties and duly executed by the Company". Neither Romano-Murphy nor the IRS has asserted that the agreement required by paragraph 1.8 was actually entered into.

As can be seen in the text reprinted above, paragraph 1.4 defined "Assumed Liabilities" to include "the general payables specifically set forth in Schedule 1.4". Schedule 1.4 is headed "SCHEDULE 1.4 General Payables". Schedule 1.4 is subdivided into two parts: (1) a part entitled "TAXES" and (2) a part entitled "General Payables". The first part of schedule 1.4, the part entitled "TAXES", is reproduced below:

| "TAXES" | | |
|---|---|---|
| | 2004 | 2005 |
| EDD--State of California | $8,975 | $5,701 |
| Georgia Dept. of Revenue | --- | 22,150 |
| Internal Revenue Services [sic] | --- | 174,300 |
| Louisiana Dept. of Revenue | --- | 10,815 |
| MA Dept. of Revenue | 5,056 | --- |
| PA Dept. of Revenue | 9,588 | --- |
| Rhode Island Division of Taxation | 11,041 | --- |
| State of New Jersey | 22,560 | --- |

| [*30] US Treasury FUTA | 64,000 | --- |
| Total taxes due | 121,220 | 212,966 |

The second part of schedule 1.4, the part entitled "General Payables", comprises an alphabetical list of NPRN's creditors and the amount owed by NPRN to each creditor. The total of these debts is given as $163,569.13. Because both schedule 1.4 and the first part of schedule 1.4 bear the same label ("General Payables"), it is not immediately clear whether the reference in paragraph 1.4 to "the general payables specifically set forth in Schedule 1.4" is a reference to schedule 1.4 in its entirety or the first part of schedule 1.4. It is unnecessary for us to resolve this ambiguity. See infra part IV.B.2.

The parties made the following stipulations regarding the significance of schedule 1.4:

61. Schedule 1.4 General Payables of the Asset Purchase Agreement reflects that $174,300.00 of the $335,261.00 of scheduled 2005 taxes would be assumed by MSSI, together with specified obligations to general creditors. The Schedule also reflects that certain funds would be available to apply to the obligations of NPRN which MSSI was assuming, leaving a nominal balance slightly in excess of $5,000.00.

62. The Asset Purchase Agreement does not specifically state which federal tax liabilities were to be assumed and paid with the $174,300.00 stated in Schedule 1.4 of the Asset Purchase Agreement.

**[\*31]**  The $335,261.00 amount referred to in paragraph 61 of the stipulation is the

sum of $174,300 and $160,961.  The $174,300 amount is the debt listed on

schedule 1.4 as a debt owed to the IRS by NPRN for 2005.  As discussed below,

the $160,961 is a debt listed on schedule 3.7 of the asset-purchase agreement as a

debt owed to the IRS by NPRN for 2005.

It is not readily apparent why the parties stipulated that it was MSSI that

assumed the liabilities of NPRN.  Paragraph 1.4 of the agreement provided that the

enumerated liabilities would be assumed by the "Purchaser", which was defined as

NAC.

Paragraph 3.7 of the agreement provided:

Liabilities.  Except as set forth on Schedule 3.7 hereto and the
Assumed Liabilities, to the knowledge of the members of the Board of
Managers of the Company [NPRN], the Company has no debts,
liabilities or other obligations which are material to the business of the
Company.

Schedule 3.7 is reproduced below:

| "SCHEDULE 3.7 - LIABILITIES NOT ASSUMED" "State Taxes other than withholding" | | |
|---|---|---|
| | 2004 | 2005 |
| Commonwealth of Massachusetts | $6,882 | --- |
| Connecticu [sic] Dept. of Labor | --- | --- |

| | | |
|---|---|---|
| **[*32]** EDD-State of California | 21,999 | $7,338 |
| Florida U.C. Fund | --- | 20,558 |
| Georgia Dept. of Labor | 4,860 | 10,796 |
| Internal Revenue Services [sic] | --- | 160,961 |
| Louisiana Dept. of Labor | 3,441 | 6,725 |
| MA--Division of Unemployment | 2,285 | --- |
| PA UC Fund | 4,532 | --- |
| PA City of Philadelphia | 14,106 | --- |
| RI Employer Tax Section | 2,685 | --- |
| State of Nevada-- Employment Security Div | --- | 11,873 |
| State of Nevada-- Dept. of Taxation | --- | 2,602 |
| State of New Jersey-- Division of Taxatio [sic] | 2,545 | --- |
| State of New Jersey--NJ 927 | 3,313 | --- |
| Texas Workforce Commission | --- | 5,189 |
| [1]Total taxes due = $296,699 | [2]68,652 | [3]228,047 |

[1]This total probably should have been $292,690.

**[\*33]** [2]This total appears to be $2,004 too high. The actual total of the amounts in the column is $66,648.
　　　[3]This total appears to be $2,005 too high. The actual total of the amounts in the column is $226,042.

It is unclear why the subheading to schedule 3.7 is "State Taxes other than

Withholding" given that one of the liabilities listed in the schedule is to the IRS, a

federal agency. The parties made the following stipulation regarding Schedule 3.7:

> Schedule 3.7 - Liabilities Not Assumed of the Asset Purchase Agreement lists "state tax liabilities other than withholding" which MSSI was explicitly not assuming. That schedule identifies the amount of $160,961.00, a portion of the $335,261.00 of scheduled 2005 taxes, as an amount that MSSI was not assuming.

> Paragraph 3.11 of the agreement provides in part:

> <u>Taxes</u>. Except as set forth on Schedule 3.11 hereto, the Company [NPRN] has duly filed all federal, provincial, and material local and foreign tax returns and reports, and all returns and reports of all other governmental units having jurisdiction with respect to taxes imposed on it or on its income, properties, sales, franchises, operations or employee benefit plans or trusts, all such returns were complete and accurate when filed, and all taxes and assessments payable by the Company have been paid to the extent that such taxes have become due. Except as set forth on Schedule 3.11 hereto, all taxes accrued or payable by the Company [NPRN] for all periods through the Closing have been accrued or paid in full, whether or not due and payable and whether or not disputed. Except as set forth on Schedule 3.11 hereto, the Company [NPRN] has withheld proper and accurate amounts from its employees for all periods in full compliance with the tax withholding provisions of applicable foreign, federal, state and local tax laws.

**[*34]** Schedule 3.11 of the agreement is reproduced below:

| "SCHEDULE 3.11 - TAXES" | | |
|---|---|---|
| | 2004 | 2005 |
| Commonwealth of Massachusetts | $6,882 | --- |
| Connecticu [sic] Dept. of Labor | --- | --- |
| EDD-State of California | 30,974 | $13,039 |
| Florida U.C. Fund | --- | 20,558 |
| Georgia Dept. of Revenue | --- | 22,150 |
| Georgia Dept. of Labor | 4,860 | 10,796 |
| Internal Revenue Services [sic] | 1,518,350 | 335,261 |
| Louisiana Dept. of Labor | 3,441 | 6,725 |
| Louisiana Dept. of Revenue | --- | 10,815 |
| MA-Division of Unemployment | 2,285 | --- |
| MA-Dept. of Revenue | 5,056 | --- |
| PA Dept. of Revenue | 9,588 | --- |
| PA UC Fund | 4,532 | --- |
| PA City of Philadelphia | 14,106 | --- |
| RI Employer Tax Section | 2,685 | --- |
| | | |

| | | |
|---|---|---|
| **[*35]** State of Nevada-Employment Security Div | --- | 11,873 |
| State of Nevada-Dept. of Taxation | --- | 2,602 |
| State of New Jersey-Division of Taxatio [sic] | 2,545 | --- |
| State of New Jersey-NJ 927 | 25,873 | --- |
| State of Rhode Island-Division of Taxat [sic] | 11,041 | --- |
| Texas Workforce Commission | --- | 5,189 |
| US Treasury FUTA | 64,000 | |
| [1]Total taxes due = $2,149,234 | [2]1,708,221 | [3]441,013 |

[1]This total probably should have been $2,145,226.

[2]This total appears to be $2,003 too high. The actual total of the amounts in the column is $1,706,218.

[3]This total appears to be $2,005 too high. The actual total of the amounts in the column is $439,008.

The parties made the following stipulation regarding Schedule 3.11:

The Asset Purchase Agreement scheduled out NPRN's state and federal tax liabilities. Schedule 3.11--Taxes reflects a total tax liability, state and federal, of $2,149,234.00, of which $1,917,611.00 were federal tax liabilities. The listed federal tax liabilities were $1,582,350.00 for 2004 and $335,261.00 for 2005.

(The sum of $1,518,350 and $64,000 is $1,582,350.)

**[*36]** The asset-purchase agreement required NAC to employ both Robert Murphy and Romano-Murphy. NAC signed an employment agreement with Romano-Murphy on June 16, 2005. Under the agreement, Romano-Murphy was employed as Vice President of Operations of NAC (later renamed Nurses Onsite Corporation or "NOC") for the period July 1, 2005 through December 26, 2006. The employment agreement provided that she would be paid $90,000 per year.

12. Completion of the Sale of Assets to MSSI

Although the asset-purchase agreement was signed on June 16, 2005, the purchase of assets was not completed until July 1, 2005. From June 16, 2005, through June 30, 2005, NPRN operated as it had before June 16, 2005. It continued to operate its business using its own managers, including Romano-Murphy.

13. The Agreement Between NPRN and the IRS Regarding the Application of the $1.6 Million Payment

Paragraph 57 of the stipulation states that NPRN and the IRS agreed that the $1.6 million payment made to the IRS under paragraph 1.6(a) of the asset-purchase agreement would be applied against NPRN's employment-tax liabilities for the first quarter of 2004 and the second quarter of 2004. As the stipulated paragraph states:

[*37] NPRN and the Internal Revenue Service reached an agreement wherein the $1.6 million paid pursuant to the Asset Purchase Agreement was applied to the employment tax liabilities of NPRN for the periods ended March 31, 2004 and June 30, 2004 [i.e., the first and second quarters of 2004].

Romano-Murphy contends that the agreement described in paragraph 57 of the stipulation also effected a compromise of all the existing tax liens on NPRN's property. In the words of her brief: "The settlement agreement entered into between Nurses PRN, LLC and the Internal Revenue Service provided a $1.6 million payment in exchange for discharge of all outstanding tax liens." The text of the agreement referred to in paragraph 57 is not in the record. The agreement is described by paragraph 57 of the stipulation only as an agreement on how the IRS would apply a particular payment. The stipulation does not describe the agreement as one in which tax liens were to be discharged or tax liabilities would be settled. We reject Romano-Murphy's contention that the agreement effected a discharge or compromise.

14. The Alleged Letter to Gary Greene Regarding the Application of the $1.6 Million Payment

Romano-Murphy contends that an unnamed lawyer for NPRN wrote a letter to IRS Revenue Officer Gary Greene directing the IRS to apply the $1.6 million payment against the trust-fund portion of the employment-tax liability, i.e., to

**[\*38]** income-tax withholding and employee FICA withholding.  The alleged letter

is not in the record.  The only evidence in the record directly concerning the letter is

Romano-Murphy's testimony.  She testified:

> I do remember very specifically that when the $1.6 million
> was drafted, there was a specific letter that told the
> government exactly how the money was to be applied,
> and the money was to be applied to the trust fund portion
> of the taxes first because we did realize there were some
> employer portion taxes that were included in that.

Our views as to the existence and content of the alleged letter are set forth infra part

II.B.

15.    The Application of the $1.6 Million Payment by the IRS

Pursuant to paragraph 1.6(a) of the asset-purchase agreement, NAC (or

perhaps MSSI on behalf of NAC) made a payment of $1.6 million.  It is unclear

whether the payment was made directly to the IRS, or whether it was made to

NPRN, which in turn paid the IRS.

Romano-Murphy proposes that the Court make various findings of fact

regarding how the IRS applied the $1.6 million it received.  The IRS does not object

to the adoption of those proposed findings of fact.  We discuss each of her proposed

findings below.

**[\*39]** First, Romano-Murphy proposes that we find that the IRS applied

$740,712.89 of the $1.6 million payment against the first quarter of 2004. The IRS

does not object to this proposed finding. The proposed finding is supported by the

record. The IRS record for this quarter reflects an entry on July 1, 2005, for a

$740,712.89 payment. The entry is labeled:

> SUBSEQUENT PAYMENT
> TRUST FUND

The "TRUST FUND" entry seemingly indicates that the IRS applied the

$740,712.89 against the trust-fund liabilities of NPRN, as opposed to other

employment-tax-related liabilities, such as the employer share of FICA. The entry

thus might support a more specific finding with respect to the application of the

$740,712.89 than that proposed by Romano-Murphy. However, Romano-Murphy

did not propose a more specific finding. Her proposed finding of fact is consistent

with the documentary evidence; we adopt it and find that $740,712.89 of the $1.6

million payment was applied by the IRS against NPRN's employment-tax liability

for the first quarter of 2004 (or to the associated interest and penalties).

Second, Romano-Murphy proposes that we find that $785,504.11 of the $1.6

million payment was applied against the second quarter of 2004. The IRS

does not object to this proposed finding. The proposed finding is supported by the

[*40] record. The IRS record for this quarter reflects an entry on July 1, 2005, for a $785,504.11 payment. The entry is labeled:

SUBSEQUENT PAYMENT
TRUST FUND

The "TRUST FUND" entry seemingly indicates that the IRS applied the $785,504.11 against the trust-fund liabilities of NPRN, as opposed to other employment-tax-related liabilities, such as the employer share of FICA. Furthermore, the $785,504.11 amount is equal to the trust-fund liability, minus payments, reported by NPRN on its Form 941 for the second quarter of 2004. The trial record thus might support a more specific finding with respect to the application of the $785,504.11 than that proposed by Romano-Murphy. However, Romano-Murphy did not propose a more specific finding. Because her proposed finding of fact is consistent with the documentary evidence, we adopt it and find that $785,504.11 of the $1.6 million payment was applied by the IRS against NPRN's employment-tax liability for second quarter of 2004 (or to the associated interest and penalties).

Third, Romano-Murphy proposes that we find that $73,783.00 of the $1.6 million payment was applied against the second quarter of 2005. The IRS does not object to this proposed finding, but the parties have already agreed on a more

[*41] specific statement in the stipulation: "The amount of $73,783.00 was applied to NPRN's employment tax liability for the period ended June 30, 2005." The stipulated statement is more precise than Romano-Murphy's proposed finding of fact because it specifies that the $73,783.00 was applied only against NPRN's employment-tax liability for the second quarter of 2005, as opposed to the associated penalties and interest. We adopt this stipulated statement as a finding of fact rather than the less precise finding of fact proposed by Romano-Murphy. The stipulated statement is not inconsistent with the trial record. The Form 4340 for the quarter shows that a $73,783.00 payment was made on July 1, 2005. The entry for the payment bears the following notation:

SUBSEQUENT PAYMENT
MISCELLANEOUS PAYMENT

This concludes our discussion of the findings of fact proposed by Romano-Murphy regarding the IRS's application of the $1.6 million payment. In addition to finding that $73,783.00 was applied against NPRN's employment-tax liability for the second quarter of 2005, we also find that (1) the $73,783.00 amount was combined by the IRS with the $189,316.63 of semiweekly deposits made by NPRN for the second quarter of 2005 for the purpose of applying both amounts against NPRN's liabilities, (2) of the $263,099.63 combined amount, the IRS

**[*42]** applied $206,812.50 against NPRN's employer share of FICA for the second quarter of 2005, and (3) the IRS applied the remaining $56,287.13 of the $263,099.63 combined amount against employee FICA withholding for the second quarter of 2005. This additional finding is supported by a memo that was authored by IRS Revenue Officer Greene on May 18, 2006. That memo shows $263,099.63 in payments being applied in the manner described above. The memo is unclear as to whether it is describing how the IRS actually applied the payments or how it should have applied the payments. Although one might argue that the memo reflects the IRS's determination of how the payments should have been applied rather than how the IRS actually applied them, Romano-Murphy does not make this argument. Instead she concedes that the IRS applied the $73,783.00 in payments against the employer share of FICA first, which amounts to a concession that the IRS applied the payments in a manner generally consistent with the Greene memo.

16.  Whether the IRS's Application of $740,712.89 of the $1.6 Million Payment Caused a Tax Overpayment for First Quarter 2004

The parties disagree on whether the IRS's application of $740,712.89 of the $1.6 million payment against NPRN's tax liabilities for the first quarter of 2004 created an overpayment that the IRS should have credited to NPRN against its

[*43] second quarter 2005 employment-tax liability. Romano-Murphy contends that NPRN's unpaid balance for the first quarter of 2004 was only $722,845.90. (For clarity, we note that the $722,845.90 is calculated before accounting for $43,546.30 of payments from NOC, as NAC would be renamed, that was applied by the IRS against NPRN's employment-tax liability for the first quarter of 2004. As we note elsewhere, Romano-Murphy argues that this $43,546.30 should not have been applied against this quarter because, she claims, NPRN had already settled its liability for the first quarter of 2004. See supra part 13, infra part II.D. Romano-Murphy contends that the application of the $740,712.89 against the unpaid balance for the first quarter of 2004 created an overpayment of $17,866.99 ($740,712.89 - $722,845.90). The IRS contends that the unpaid balance for that quarter was $722,845.90 in employment taxes and $127,654.96 in penalties and interest. We agree with the IRS. The IRS record for NPRN's first quarter of 2004 reflects that the federal-tax-deposit penalty alone was $103,376.88. We thus conclude that the application of the $740,712.89 against NPRN's liabilities for the first quarter of 2004 did not create an overpayment.

17. The Form 941 for Second Quarter 2005

NPRN filed a quarterly employment-tax return, Form 941, for the second quarter of 2005. The return, which was dated July 29, 2005, was signed by

**[*44]** Romano-Murphy as NPRN's chief operating officer. We discussed this return supra part 9 in the context of Romano-Murphy's concessions regarding NPRN's employment-tax liability. As noted above, the return reported a total employment-tax liability of $609,832.01.

18.  Romano-Murphy's Awareness of NPRN's Employment-Tax Liability
     for Second Quarter 2005

As the parties have stipulated, Romano-Murphy was aware that employment taxes were due from NPRN for the second quarter of 2005. The parties have also stipulated that she was never advised by a lawyer or an IRS employee that employment taxes for NPRN were not due for the second quarter of 2005.

19.  NAC Begins Operations; Renamed NOC

As noted above, NAC's purchase of NPRN's assets was not completed until July 1, 2005. See supra part 12. On July 1, 2005, NPRN's assets and employees, including Romano-Murphy, were transferred to NAC. Sometime afterwards, NAC was renamed Nurses Onsite Corp. We use the acronym NOC to refer to Nurses Onsite Corp. From July 1 through December 31, 2005, Murphy was president of NOC. From July 1, 2005 through August 7, 2006, Romano-Murphy was the vice president of operations of NOC. Romano-Murphy ceased her employment with NOC on August 7, 2006.

**[\*45]** 20. <u>The $70,000 of Payments by NOC of NPRN's Taxes That</u>
<u>Were Applied by the IRS Against Fourth Quarter 2003,</u>
<u>First Quarter 2004, and Second Quarter 2004</u>

Following its purchase of NPRN's assets, NOC made $70,000 in payments of

NPRN's employment taxes (or related penalties or interest).  The following

table lists the amount of each payment, the date on which each payment

was applied by the IRS, and the quarter against which each payment was applied:

| $70,000 of payments by NOC of NPRN's employment taxes (or related interest and penalties) | | |
|---|---|---|
| <u>Date payment applied</u> | <u>Quarter and year against which payment applied</u> | <u>Amount of payment</u> |
| July 26, 2005 | 4Q 2003 | $6,453.70 |
| July 26, 2005 | 1Q 2004 | 3,546.30 |
| Aug. 24, 2005 | 1Q 2004 | 10,000.00 |
| Oct. 3, 2005 | 1Q 2004 | 10,000.00 |
| Nov. 21, 2005 | 1Q 2004 | 10,000.00 |
| Dec. 28, 2005 | 1Q 2004 | 10,000.00 |
| Feb. 7, 2006 | 1Q 2004 | 10,000.00 |
| Feb. 27, 2006 | 2Q 2004 | 10,000.00 |
| Total | | 70,000.00 |

[*46] Earlier, we discussed why we reject Romano-Murphy's contention that NPRN had already settled its tax liabilities for these quarters by the time the above payments were made.  See supra part 13.

21.    After 2005

On July 11, 2006, Resolve Staffing, Inc., a contingent-staffing firm, signed a letter of intent to acquire the assets of NOC for $800,000.  The letter would have required the $800,000 to be used to satisfy four "specific unpaid liabilities" of MSSI.  One of these liabilities was "The unpaid IRS liability of Nurses on Site, Inc.'s [NOC's] predecessor corporation Nurses PRN, LLC [NPRN] and of the predecessor's Principals now delinquent under the purchase agreement between Nurses PRN, LLC and MSSI."  MSSI did not sign the letter of intent.  An attorney for MSSI opposed the sale on the grounds that none of the proceeds would have gone to Cornell Capital Partners, a hedge fund that owned preferred shares of MSSI.

The parties have stipulated that on July 26, 2006, the IRS "issued" a "levy" to MSSI in order to collect the federal employment taxes due from NPRN for the second quarter of 2005.

On July 26, 2006, the IRS mailed a Letter 1153, Trust Funds Recovery Penalty Letter, to Romano-Murphy stating that $346,732.38 was the amount of

**[*47]** NPRN's unpaid trust-fund liabilities for the second quarter of 2005. This $346,732.38 amount is consistent with IRS's determination that Romano-Murphy was liable for the $206,812.51 employee portion of FICA plus $196,207.00 in income-tax withholding minus the $53,287.13 portion of the $263,099.63 in deposits and payments that the IRS had applied against the second quarter of 2005. See infra part II, table. The letter stated that the IRS proposed to assess that amount against Romano-Murphy as a section 6672 penalty. The letter stated that Romano-Murphy could appeal the proposed assessment by mailing a written appeal to the IRS within 60 days.

On August 6, 2006, a letter of intent was drafted that contemplated the merger of the operations of the following entities:

- •Day Holding, LLC, a company, that, like NAC, provided nurses to hospitals and other medical facilities;

- •RealTime Services, Inc., a company that provided payroll services and administrative services to Day Holding, LLC; and

- •NAC.

The letter of intent stated that the operations of the companies would be merged and each company would become the subsidiary of a new holding company. The letter of intent stated that it was understood "that any payroll tax delinquencies

[*48] will be discussed and resolved with the Internal Revenue Service" before the closing of the transaction. The letter of intent was never signed by Day Holding, LLC, RealTime Services, Inc., NAC, MSSI, or Cornell Capital Partners.

On September 6, 2006, Romano-Murphy responded to the Letter 1153 by writing a letter to IRS Revenue Officer Gary Greene. She requested a hearing to appeal the proposed assessment. The IRS did not grant her request.

On September 6, 2006, John Quirk, the president and chief executive officer of General Healthcare Resources, Inc., wrote a letter to Dr. Sahay, the chief executive officer of both MSSI and NOC. In the letter, General Healthcare Resources, Inc., offered to purchase the assets of NOC for $2,850,000. Paragraph 4 of the letter stated that General Healthcare Resources, Inc., would not assume any of NOC's liabilities. MSSI did not sign the letter of intent.

On November 30, 2006, a letter of intent was drafted to be signed by (1) Peter Hietpas, the president of PRN Health Services, Inc., and (2) Dr. Sahay, chairman and chief executive officer of MSSI. The letter of intent contemplated that PRN Health Services, Inc., would acquire all of the assets of NOC for $1 million cash. Cornell Capital Partners (the hedge fund that owned preferred shares in MSSI) would not approve the offer.

**[*49]** On December 12, 2006, the IRS filed a notice of federal tax lien in Palm Beach County, Florida, against NPRN's property to collect NPRN's unpaid federal employment taxes for the second quarter of 2005. On December 26, 2006, the IRS filed a notice of federal tax lien in Palm Beach County, Florida, against the property of NOC, as successor to NPRN, to collect NPRN's unpaid employment taxes for the second quarter of 2005.

The parties stipulated that on December 27, 2006, three separate chapter 11 bankruptcy petitions were filed in the U.S. District Court for the Eastern District of Virginia by MSSI, its subsidiary NOC, and another MSSI subsidiary.

On April 24, 2007, Romano-Murphy filed a proof of claim in MSSI's bankruptcy case on behalf of NPRN.

On October 15, 2007, the IRS assessed a trust-fund-recovery penalty of $346,732.38 against Romano-Murphy for NPRN's unpaid trust-fund taxes for the second quarter of 2005.

The United States filed a proof of claim in MSSI's bankruptcy case. It claimed that MSSI owed trust-fund taxes of $346,732.38 for the second quarter of 2005. MSSI objected to this proof of claim. On December 10, 2007, the United States responded to MSSI's objection. It made three separate arguments. First, it argued: "Nurses Onsite Corporation [NOC] is liable for the tax debts of Nurses

[*50] PRN LLC [NPRN] under the de facto merger doctrine." Second, it argued: "Nurses Onsite Corporation is a continuance of Nurses PRN LLC with a common identity and thus liable for Nurses PRN LLC's tax debts." Third, it argued: "Debtor [MSSI], pursuant to an asset purchase agreement, expressly assumed $174,300 of the 2005 withholding-tax liabilities in the amount of $346,732.38." A bankruptcy trustee was appointed. The trustee withdrew MSSI's objection to the United States' proof of claim, according to the bankruptcy court, for "cost benefit reasons".

On August 25, 2008, the IRS served Romano-Murphy a notice of intent to levy to collect the trust-fund-recovery penalty for NPRN's trust-fund taxes for the second quarter of 2005.

On September 5, 2008, Romano-Murphy was served a notice of federal tax lien filing to collect the trust-fund-recovery penalty of $346,668.23 for NPRN's trust-fund taxes for the second quarter 2005. The record does not explain why this $346,668.23 amount is less than the amount assessed on October 15, 2007.

On September 9, 2008, Romano-Murphy mailed a timely request for a collection-review hearing via Form 12153, Request for a Collection Due Process or Equivalent Hearing. The request was received by the IRS Office of Appeals on September 12, 2008. The request contested the following collection actions

[*51] against Romano-Murphy: (1) the August 25, 2008 proposed levy against Romano-Murphy, and (2) the September 5, 2008 notice of federal tax lien filing against Romano-Murphy. The request also contested a notice of federal tax lien filing issued to Robert Murphy on June 17, 2008, but the request (which was cosigned by Robert Murphy) was untimely with respect to Robert Murphy's notice. The request stated its grounds as follows:

> Tax liability assumed by another company via asset purchase agreement.

and

> Liability assumed by other entity. Proof of claim filed U.S. I.R.S. Attorney supports claim in position paper provided to courts.

The parties agree that the Form 12153 "challenged the assessment of the TFRP [trust-fund-recovery penalty] and sought a lien discharge on the basis that the debt was assumed by another entity."

On February 24, 2009, a face-to-face hearing was conducted between Romano-Murphy and the IRS Office of Appeals.

The IRS Office of Appeals mailed a notice of determination to Romano-Murphy on November 20, 2009. The notice of determination stated in part:

<u>Relevant Issues Presented by the Taxpayer</u>

> In the Form 12153 you indicated disagreement with the Notice of Federal Tax Lien filed and the Final Notice of Intent to Levy. You

**[\*52]** requested a Lien Discharge, citing "Tax liability assumed by another company via asset purchase agreement." The reason for disagreement states in part "Liability assumed by other entity. Proof of claim filed. US IRS Attorney supports claim in position paper provided to courts."

During the hearing of 2/24/09 you raised the liability assessed and stated that you had requested an appeal on the proposed assessment, however you did not get the opportunity of an appeal. You also indicated that you had filed an 843 Claim in order to have the liability reviewed by the Service. Your issue of protest is that the liability of Nurses PRN LLC which generated the employment liability for the quarter in question is not responsible for the tax. You indicated that the tax should have been absorbed through the sale of Nurses PRN LLC to Nurses Onsite Corporation thru an asset purchase agreement. However, the sale did not materialize and the buyer filed bankruptcy. The SO agreed to obtain the Trust Fund Package in order to review the assessment. However, if it was determined that the proposed assessment had been reviewed by Appeals, it would be precluded from being raised again. We discussed that while the Trust Fund Package was being secured we agreed that a collection alternative should be consider [sic] and you agreed to provide the financial information necessary for consideration of a collection alternative.

On 10/28/2009 a telephone conference was held. During the conference you were advised that the Trust Fund Package for the assessment of the Civil Penalty had been reviewed and based on the information contained in the package you were determined to be a responsible person for the payment of the Trust Fund Tax for the period in question. You were also advised that review of records showed that the tax period in question was not part of the settlement you addressed in your issues of protest but rather had accrued subsequent to the settlement being raised. You were also advised that your financial information had been reviewed, and that the total liability could be paid within the collection statute including a 1 year adjustment of actual expenses. The payment plan discussed was for $4,575.00 per month. We additionally discussed an Offer in Compromise to resolve the liability, not only for the Civil Penalty, but

[*53] for a joint income tax liability period ending 12/2006. At that time you indicated you would work with the Revenue Officer to try to obtain a lower payment plan. You were advised that the Notice of Federal Tax Lien filed 9/5/2008 and the Final Notice of Intent to Levy would be sustained.

The notice of determination sustained the notice of federal tax lien and the notice of intent to levy. The notice does not say what the Appeals Office determined to be the correct amount of Romano-Murphy's liability for the trust-fund-recovery penalty. However, the parties have stipulated that "Respondent's determination of the amount of the trust-fund-recovery penalty for the 2005/06 period [after payments] is * * * $346,732.38" Thus, the parties treat the Appeals Office as having determined that the unpaid liability was $346,732.38. Like the parties, we consider the Appeals Office to have determined that the unpaid liability was $346,732.38. When she filed her petition challenging the notice of determination, Romano-Murphy resided in Florida.

OPINION

I.  Applicable Legal Principles

A.  Collection-Review Hearing

The IRS filed a notice of federal tax lien to collect the trust-fund-recovery penalty it had assessed against Romano-Murphy. The IRS also served on Romano-Murphy a notice of intent to levy to collect the assessment. Both the lien

**[*54]** notice and the levy notice gave Romano-Murphy a statutory right to a collection-review hearing with the IRS Appeals Office. See secs. 6320(a)(1) (notice of filing of lien), 6330(a)(1) (levy notice). Romano-Murphy requested such a hearing. At a collection-review hearing, a taxpayer is entitled by statute to challenge the existence and amount of the underlying tax liability if he or she did not have a prior opportunity to dispute the tax liability. Secs. 6320(c), 6330(c)(2)(B). Because Romano-Murphy had not had a prior opportunity to dispute the trust-fund-recovery penalty assessed against her, the Appeals Office allowed Romano-Murphy to contest the penalty. The Appeals Office determined that she was liable for the assessed amount.

The Tax Court has jurisdiction to review determinations of the Appeals Office to sustain a levy or the filing of a notice of federal tax lien. Secs. 6320(c) (lien cases), 6330(d)(1) (levy cases). With respect to the disputed liability, the Court's scope of review is de novo. 535 Ramona Inc. v. Commissioner, 135 T.C. 353, 357-358 (2010), aff'd, 461 Fed. Appx. 567 (9th Cir. 2011). This means that with respect to the disputed liability, we review the evidence in the trial record, not just the administrative record. Id.

Where, as in this case, the underlying tax liability was properly at issue at the hearing before the Appeals Office, the standard of review is de novo. Goza v.

[*55] Commissioner, 114 T.C. 176, 181-182 (2000).  Under a de novo standard of review we do not accord deference to the determination of the Appeals Office.  The IRS concedes that the aspects of the notice of determination challenged by Romano-Murphy are subject to a de novo standard of review.

Our findings are based on the preponderance of the evidence.  Therefore, we need not determine which party--Romano-Murphy or the IRS--has the burden of proof.  See Mason v. Commissioner, 132 T.C. 301, 323 (2009).

B.    An Employer's Liability for Employment Taxes and FUTA
      Taxes

An employer is subject to federal taxes on wages paid to employees.  An employer must pay a tax equal to 6.2% of wages for the Social-Security portion of the tax and 1.45% for the Medicare portion of the tax.  Sec. 3111(a) and (b).  Another tax, computed at the same rates (6.2% and 1.45%), falls on employees.  Sec. 3101(a) (6.2% Social-Security tax on wages received by employees) and (b) (1.45% Medicare tax on wages received by employees).  Both the tax on employers and the tax on employees are referred to as the FICA, "Federal Insurance Contributions Act", tax.  See McDonald v. S. Farm Bureau Life Ins. Co., 291 F.3d 718, 721 (11th Cir. 2002).  In addition, an employer must withhold the employee share of FICA from the wages paid and must pay the withheld

[*56] amount to the IRS. Sec. 3102(a) (the employee share of FICA must be collected by the employer by deducting and withholding the amount of tax from wages as paid) and (b) (every employer required to deduct the employee share of FICA is liable for payment of the employee share of FICA). Moreover, an employer is obligated to withhold from wages amounts for the income taxes owed by its employees and must pay the withheld amount to the IRS. Secs. 3402(a)(1) ("every employer making payment of wages shall deduct and withhold upon such wages a tax determined in accordance with tables or computational procedures prescribed by the Secretary [of the Treasury]"), 3403 (every employer that is required to deduct income tax is liable for payment of the deducted amount). Once net wages are paid to the employee, the IRS credits the employee with the taxes withheld, even if the employer does not pay over the withheld amount to the IRS. See Slodov v. United States, 436 U.S. 238, 243 (1978). The term "employment taxes" refers to all three of the employer's obligations that we have just discussed: (1) employer share of FICA, (2) employee FICA withholding, and (3) income-tax withholding. See supra part 2. The term "trust-fund taxes" refers to the last two obligations. See Pollack v. Commissioner, 132 T.C. 21, 25 n.10 (2009).

[*57] Each calendar quarter, an employer must file a Form 941 reporting its employment-tax obligations for the quarter. 26 C.F.R. secs. 31.6011(a)-4(a)(1) (2005) (income-tax withholding), 31.6011(a)-1 (2005) (FICA). With some exceptions that are not applicable to NPRN, the Form 941 is generally due one month after the end of the quarter. 26 C.F.R. sec. 31.6071(a)-1(a)(1) (2011). The employment taxes must be paid on or before the date the Form 941 is to be filed. See sec. 6151(a) (a taxpayer who is required to file a tax return must pay the tax at the time and place fixed for filing the return). Thus, the taxes are due one month after the end of the quarter. If the taxes are not paid by the date payment is due, the employer is liable for a late-payment penalty. See sec. 6651(a)(2) (failure to pay the amount of tax shown on the return results in a penalty of up to 25% of the amount of tax shown on return).

Another federal tax on wages is the federal unemployment tax ("FUTA tax"). See sec. 3301(1). This is a 6.2% excise tax imposed on each employer with respect to wages paid to its employees. Id. Generally, the wages subject to the tax include "all remuneration for employment" that does not exceed $7,000 for the calendar year. Sec. 3306(b)(1). The employer must report its unemployment-tax liability on a Form 940, Employers' Annual Federal Unemployment Tax Return. 26 C.F.R. sec. 31.6011(a)-3(a) (2011). The Form 940 is generally due a month

**[\*58]** after the end of the calendar year. 26 C.F.R. sec. 31.6071(a)-1(c) (2005).

Even though the FUTA tax is imposed on wages, we do not use the term

"employment taxes" to refer to the FUTA tax.

In addition to its quarterly obligation to pay its employment taxes a month

after the quarter has ended, an employer must make deposits of its employment

taxes throughout the quarter. 26 C.F.R. sec. 31.6302-1(a) (2005). Employment

taxes for purposes of the deposit requirement are defined by 26 C.F.R. sec.

31.6302-1(e)(1) (2005) to include (1) "The employer tax under section 3111", that

is, the employer share of FICA, (2) "The employee portion of the tax withheld under

section 3102", that is, employee FICA withholding, and (3) "The income tax

withheld under sections 3402 and 3405, that is, income-tax withholding. FUTA

taxes are not included in this definition of employment taxes. Employers are

classified by regulation as either monthly depositors or semiweekly depositors. 26

C.F.R. sec. 31.6302-1(a) (2005). A monthly depositor must make deposits monthly.

26 C.F.R. sec. 31.6302-1(c)(1) (2005). A semiweekly depositor must make

deposits semiweekly. 26 C.F.R. sec. 31.6302-1(c)(2) (2005). The schedule for

making semiweekly deposits is set forth in the regulation as follows:

> An employer that is a semi-weekly depositor for a calendar year must
> deposit its employment taxes in an authorized financial institution on or
> before the dates set forth below:

| [*59] Payment dates/semi-weekly periods | Deposit date |
|---|---|
| Wednesday, Thursday and/or Friday. | On or before the following Wednesday |
| Saturday, Sunday, Monday and/or Tuesday. | On or before the following Friday |

26 C.F.R. sec. 31.6302-1(c)(2)(i) (2005).  As explained supra part 2, NPRN is a

semiweekly depositor.

Unless specifically exempted, taxpayers who deposit more than $200,000 a

year in employment taxes and certain other taxes must use electronic funds transfer

to make deposits of these taxes.  This requirement is set forth by regulation:

> Unless exempted under paragraph (h)(5) of this section, a taxpayer that
> deposits more than $200,000 of taxes described in paragraph (h)(3) of
> this section during a calendar year beginning after December 31, 1997,
> must use electronic funds transfer (as defined in paragraph (h)(4) of
> this section) to make all deposits of those taxes that are required to be
> made for return periods beginning after December 31 of the following
> year and must continue to deposit by electronic funds transfer in all
> succeeding years. * * *

26 C.F.R. sec. 31.6302-1(h)(2)(ii) (2005).  The taxes "described in paragraph (h)(3)

of this section" include an employer's employment-tax liability.  26 C.F.R. sec.

31.6302-1(h)(3) (2005) (electronic funds transfer requirement applies for taxes

required to be deposited under 26 C.F.R. sec. 31.6302-1).  "[P]aragraph

**[*60]** (h)(5) of this section" (i.e., 26 C.F.R. sec. 31.6302-1(h)(5) (2005)) provides

that

> If any categories of taxpayers are to be exempted from the requirement
> to deposit by electronic funds transfer, the Commissioner will identify
> those taxpayers by guidance published in the Internal Revenue Bulletin.
> * * *

26 C.F.R. sec. 31.6302-1(h)(2)(iii) (2005) provides that even a taxpayer that is not

required by paragraph (h)(2)(ii) to make electronic deposits of the taxes described

by paragraph (h)(3) may voluntarily make the deposits by electronic funds transfer.

An electronic funds transfer is defined as "any transfer of depository taxes made in

accordance with Revenue Procedure 97-33 * * * or in accordance with procedures

subsequently prescribed by the Commissioner."  26 C.F.R. sec. 31.6302-1(h)(4)(i)

(2005).  Rev. Proc. 97-33 states:

> ELECTRONIC FUNDS TRANSFER (EFT).  An "EFT" is any
> transfer of funds, other than a transaction originated by check, draft, or
> similar paper instrument, which is initiated through an electronic terminal,
> telephonic instrument, computer, or magnetic tape so as to order, instruct, or
> authorize a financial institution or other financial intermediary to debit or
> credit an account.

**[\*61]** Rev. Proc. 97-33, sec. 3.06, 1997-2 C.B. 371, 372.[2]  As we explain infra part II.A, we find NPRN was required to make its deposits of employment taxes by electronic funds transfer.

In 1996, the Treasury Department established the Electronic Federal Tax Payment System ("EFTPS").  See IRS Information Release 2001-77, 2001 IRB LEXIS 313, at \*1-\*2 (Sept. 6, 2001).  EFTPS is the system for making electronic funds transfers.  Rev. Proc. 97-33, sec. 2.02, 1997-2 C.B. at 371.  All taxpayers who make federal tax deposits or federal tax payments by electronic funds transfer must use EFTPS.  See id.  There are two primary payment options under EFTPS: (1) Automated Clearing House debit entry, and (2) Automated Clearing House credit entry.  Id.  The Automated Clearing House is a funds transfer system that "provides for the interbank clearing of electronic entries for participating financial institutions."  Id.  An Automated Clearing House debit entry is "a transaction in which one of the Treasury Financial Agents, upon instructions from a taxpayer, instructs the taxpayer's financial institution to withdraw funds from the taxpayer's account for an FTD or FTP [federal tax deposit or federal tax payment] and to

---

[2]Rev. Proc. 97-33, sec. 9.03, 1997-2 C.B. 371, 374, was modified by Rev. Proc. 98-32, secs. 11.04 and 23, 1998-1 C.B. 935, 940, 942.  None of our determinations involve Rev. Proc. 97-33, sec. 9.03.  Rev. Proc. 98-32, supra, was modified and superseded by Rev. Proc. 2012-33, 2012-34 I.R.B. 272.  Rev. Proc. 2012-33, supra, does not mention Rev. Proc. 97-33, supra.

[*62] route the FTD or FTP to the appropriate [Department of the] Treasury account through the ACH [Automated Clearing House] system." Id. sec. 3.04. (A Treasury Financial Agent is a financial institution that has been designated an agent of the Treasury Department. Id. sec. 3.11, 1997-2 C.B. at 372.) An Automated Clearing House credit entry is a "transaction in which a financial institution, upon instructions from a taxpayer, originates an FTD or FTP [federal tax deposit or federal tax payment] to the appropriate Department of the Treasury * * * account through the ACH [Automated Clearing House] system." Id. sec. 3.03. The third payment option under EFTPS is electronic tax application. Id. sec. 2.05. Electronic tax application, also referred to as "Same Day Payment", is "a subsystem of EFTPS [the Electronic Federal Tax Payment System] that receives, processes, and transmits an FTD or an FTP [federal tax deposit or federal tax payment] and the related tax payment information for taxpayers that make same day payments through Fedwire value transfers, Fedwire non-value transactions, and Direct Access transactions [three types of electronic payments]. Id. sec. 3.07. Fedwire is the funds-transfer system owned and operated by Federal Reserve banks. See Rev. Proc. 94-48, sec. 6.11, 1994-2 C.B. 694, 696. It does not include the Automated Clearing House System. Id. A taxpayer must submit an enrollment form before participating in EFTPS. Rev. Proc. 97-33, secs. 4.01, 4.05, 1997-2

**[\*63]** C.B. at 372. When the enrollment process is completed, a Treasury Financial Agent notifies the taxpayer of enrollment in the system by sending the taxpayer a confirmation form, an information booklet, and a personal identification number. Id. sec. 4.04. It appears that taxpayers can make electronic transfers of funds without using EFTPS. IRS Information Release 2004-52, 2004 IRB LEXIS 166, at \*1 (Apr. 9, 2004) ("There are three ways taxpayers can let technology help them pay their taxes: by authorizing withdrawals from their savings or checking accounts, through the Electronic Federal Tax Payment System (EFTPS) or by charging it to certain charge cards."). However, electronic transfers outside EFTPS would presumably not qualify as electronic funds transfers for the purpose of 26 C.F.R. sec. 31.6302-1(h)(2)(ii) (2005). As we conclude infra part II.A., NPRN was required to make its federal tax deposits by using EFTPS. Furthermore, NPRN did make its federal tax deposits using EFTPS.

In 2001, the Treasury Department established EFTPS-OnLine. IRS Information Release 2001-77, 2001 IRB LEXIS 313, at \*1. This system is the internet version of EFTPS. See IRS Information Release 2003-90, 2003 IRB LEXIS 320, at \*1 (July 21, 2003). A taxpayer can participate in EFTPS without participating in EFTPS-OnLine. See IRS Information Release 2001-77, 2001 IRB LEXIS 313, at \*4 ("EFTPS-Online has been in its pilot stage since October 2000.

**[\*64]** <u>Like other methods of EFTPS</u>, the online option is a service offered free to taxpayers by the U.S. Department of Treasury." (Emphasis added.)). As we explain <u>infra</u> part II.A., we conclude that NPRN was not required to make its federal tax deposits through EFTPS-OnLine. Additionally, we conclude that NPRN did not make its federal tax deposits through the electronic federal tax payment system online. <u>See</u> <u>infra</u> part II.A.

An employer who is required by law or regulation to deposit employment taxes, and who fails to do so, is liable for a penalty under section 6656(a). The amount of the penalty is a percentage of the underpayment. <u>Id.</u> An underpayment is defined as the amount of tax required to be deposited minus the amount of tax actually deposited on or before the date the deposit was required to be made. Sec. 6656(b)(2). The percentage of the penalty depends on the length of the taxpayer's delay in making the deposit. <u>See</u> sec. 6656(b)(1). At least one court has concluded that an employer who is required to make deposits by electronic funds transfer, but who instead makes the deposits through a nonelectronic transfer, is liable for the failure-to-deposit penalty. <u>F.E. Schumacher Co. v. United States</u>, 308 F. Supp. 2d 819, 828 (N.D. Ohio 2004).

A deposit of a tax is treated as a payment of a tax made on the due date of the relevant tax return, determined without regard to extensions, or, if later, the

[*65] date the deposit was made.  26 C.F.R. sec. 31.6302-1(i)(6) (2005).  Thus, an employer's deposit of employment tax is relevant to determining not only the penalty for failing to deposit employment taxes, see sec. 6656(a), but also the penalty for failing to pay employment taxes, see sec. 6651(a)(2).

Should an employer fail to withhold and pay trust-fund taxes, section 6672 authorizes the government to collect an equivalent amount from the employer's officers or employees who are responsible for collecting the taxes.  Such persons are commonly referred to as "responsible persons."  Slodov, 436 U.S. at 245-246 n.7. The penalty imposed by section 6672 is referred to as the "trust fund recovery penalty."  See Weber v. United States, 138 T.C. __, __ (slip. op. at 16) (May 7, 2012).  The IRS determined that Romano-Murphy was a "responsible person" of NPRN who willfully failed to pay over its trust-fund taxes.  It assessed against her the penalty for trust-fund taxes that were not paid over.

II.    The Unpaid Amount of NPRN's Trust-Fund Taxes for Second Quarter
       2005

If Romano-Murphy was a responsible person who willfully failed to pay over NPRN's trust-fund taxes for the second quarter of 2005 (and we do conclude that she was a responsible person, see infra part III, who willfully failed to pay over the trust-fund taxes, see infra part IV), the amount of her liability is equal to

**[\*66]** NPRN's unpaid trust-fund taxes for the second quarter of 2005. See Slodov, 436 U.S. at 244-245 ("[T]he officers or employees of the employer responsible for effectuating the collection and payment of trust-fund taxes who willfully fail to do so are made personally liable to a 'penalty' equal to the amount of the delinquent taxes."). The parties disagree as to the amount of these unpaid trust-fund taxes. The IRS stands by the determination of its Appeals Office that NPRN's unpaid trust-fund taxes for the second quarter of 2005 are $346,732.38. The $346,732.38 amount results from the following computations:

| | (1) Employer share of FICA | (2) Employee FICA withholding | (3) Income-tax withholding | (4) Total employment tax = (1)+(2)+(3) | (5) Trust-fund taxes = (2)+(3) |
|---|---|---|---|---|---|
| IRS position — Unpaid trust-fund taxes of NPRN for second quarter 2005 | | | | | |
| Amount owed | $206,812.50 | $206,812.51 | $196,207.00 | $609,832.01 | $403,019.51 |
| Amount paid | 206,812.50 | 56,287.13 | 0.00 | 263,099.63 | 56,287.13 |
| Balance | 0.00 | 150,525.38 | 196,207.00 | 346,732.38 | 346,732.38 |

We now explain Romano-Murphy's position, which is that NPRN's unpaid trust-fund taxes are $40,044.03. Paragraph 75 of the stipulation of facts states that Romano-Murphy alleges that $139,027.86 is the correct computation of the balance of the trust-fund taxes owed by NPRN for the second quarter of 2005. By comparison, the IRS's computation is $346,732.38. Paragraph 75 reflects that

[*67] Romano-Murphy's computation of the $139,027.86 amount deviates from the IRS's computation in three respects. First, Romano-Murphy's position in paragraph 75 assumes that total employment taxes (before accounting for payments) were only $607,938.72. As explained supra part 9, this assumption is inconsistent with paragraph 59 of the stipulation and has been abandoned by Romano-Murphy in her brief. Second, Romano-Murphy contends that NPRN's $189,316.63 in semiweekly deposits during the second quarter of 2005 should have been applied by the IRS entirely against trust-fund taxes for that quarter, rather than against the employer share of FICA. This contention is also still maintained by Romano-Murphy. Third, she contends that the $73,783.00 portion of the $1.6 million payment that was applied by the IRS against NPRN's employment taxes for the second quarter of 2005 should have been applied entirely against trust-fund taxes rather than against the employer share of FICA. This contention is also still maintained by Romano-Murphy.

In paragraph 26 of her brief, Romano-Murphy substitutes $139,920.09 for the $139,027.86 amount that was reflected in paragraph 75 of the stipulation. The $139,920.09 amount, which she refers to in her brief as the "preliminary outstanding trust fund balance", appears to be based on computations that we illustrate in the chart below:

| [*68] | Romano-Murphy's position<br>Unpaid trust-fund taxes of NPRN for second quarter 2005<br>"preliminary outstanding trust fund balance" | | | | |
|---|---|---|---|---|---|
| | (1) Employer share of FICA | (2) Employee FICA with-holding | (3) Income tax with-holding | (4) Total employment tax = ((1)+(2)+(3)) | (5) Trust-fund taxes = (2)+(3) |
| Amount owed | $206,812.29 | $206,812.29 | $196,207.43 | $609,832.01 | $403,019.72 |
| Amount paid | 0.00 | --- | --- | 263,099.63 | 263,099.63 |
| Balance | 0.00 | --- | --- | 346,732.38 | 139,920.09 |

The reason four of the entries in the chart are blank is that, unlike the IRS, Romano-Murphy does not explain how the $187,316.63 in semiweekly deposits or the $73,783.00 portion of the $1.6 million payment should be divided between employee FICA withholding and income-tax withholding.

Paragraph 26 of Romano-Murphy's brief takes the position that NPRN owed only $139,920.09, a calculation that seems to take into account only the application of the $189,316.63 in semiweekly deposits and the application of the $73,783.00 amount from the $1.6 million payment. But it is apparent from other parts of Romano-Murphy's brief that she contests more than just the IRS's application of the $189,316.63 of semiweekly deposits and the $73,783.00 from the $1.6 million payment against employment-tax liabilities other than trust-fund taxes. She contends that the IRS failed to apply amounts against second quarter

[*69] 2005 trust-fund taxes in five different ways. Even though these five errors alleged by Romano-Murphy are not reflected in paragraph 75 of the stipulation, which purportedly shows what she "alleges" to be "the amount of the trust fund recovery penalty", the IRS does not contend that her agreement to paragraph 75 of the stipulation bars her from pressing her contentions about the five alleged errors. The five alleged errors are described below.

First, Romano-Murphy contends that NPRN's payments and deposits for the fourth quarter of 2003 resulted in a $1,982.38 overpayment of the employment taxes for that quarter. See supra part 3, infra part II.E. She contends that this $1,982.38 overpayment should have been applied against the second quarter of 2005, and, in particular, against the trust-fund taxes.

Second, Romano-Murphy contends that NPRN had a $27.47 overpayment of the employment taxes for the fourth quarter of 2004. See supra part 3, infra part II.E. She contends that this $27.47 overpayment should have been applied against the second quarter of 2005, and, in particular, against the trust-fund taxes.

Third, Romano-Murphy contends that a combination of NPRN's deposits for the first quarter of 2004 and the application of $740,712.89 of the $1.6 million payment against liabilities from that quarter resulted in a $17,866.99 overpayment for that quarter. See supra part 16, infra part II.C. She contends that this alleged

**[\*70]** $17,866.99 overpayment should have been applied against the second quarter of 2005, and, in particular, against the trust-fund taxes.

Fourth, Romano-Murphy contends that $70,000 of payments made by NOC against NPRN's employment taxes (or related penalties or interest) should not have been applied against NPRN's employment taxes for the fourth quarter of 2003, the first quarter of 2004, or the second quarter of 2004. See supra part 20, infra part II.D. She claims that by the time the payments were made, the IRS had compromised or settled NPRN's liabilities for these three quarters. See supra part 13. Thus, she claims, the $70,000 in payments should have been applied against NPRN's employment taxes for the second quarter of 2005, and, in particular, against the trust-fund taxes.

Fifth, Romano-Murphy contends that there was a $9,999.22 overpayment for the first quarter of 2005 and that this overpayment should have been applied against NPRN's employment taxes for the second quarter of 2005, and, in particular, against the trust-fund taxes. See supra part 8, infra part II.E.

We summarize Romano-Murphy's computations in the table below. For the convenience of the parties, we note the corresponding paragraph numbers of Romano-Murphy's brief:

| [*71] Amounts used in Romano-Murphy's brief to calculate her position that NPRN's trust-fund liability for the second quarter of 2005 was $40,044.03 | | |
|---|---|---|
| Description of amount used by Romano-Murphy in computing NPRN's trust-fund liability for the second quarter of 2005 | Paragraph number of brief | Amount |
| NPRN's trust-fund taxes (before payments) | Para. 24 | $403,019.72 (the difference between $609,832.01 and $206,812.29) |
| Semiweekly deposits | Para. 25 | (189,316.63) |
| Portion of $1.6 million payment allocated by IRS to 2Q 2005 | Para. 25 | (73,783.00) |
| Running total | Para. 26 | 139,920.09 |
| 1Q 2004 alleged overpayment | Para. 35 | (17,866.99) |
| Payments from NOC | Para. 46 | (70,000.00) |
| Running total | Para. 47 | 52,053.10 |
| 4Q 2003 alleged overpayment | Para. 48 | (1,982.38) |
| 4Q 2004 alleged overpayment | Para. 48 | (27.47) |
| 1Q 2005 alleged overpayment | Para. 48 | (9,999.22) |
| Total | Para. 49 | 40,044.03 |

A.    Application of the $189,316.63 in Semiweekly Deposits

The parties agree that NPRN deposited $189,316.63 toward its employment-tax liability for the second quarter of 2005. They disagree on how the deposits should have been applied.

[*72] As explained before, in applying the $189,316.63 of semiweekly deposits against NPRN's second quarter 2005 employment-tax liability, the IRS grouped the deposits together with a $73,783.00 payment that was made on July 1, 2005. See supra part 15. The resulting $263,099.63 amount was applied by the IRS first against NPRN's $206,812.50 employer share of FICA liability for the quarter, resulting in the complete elimination of the $206,812.50 employer share of FICA liability. The remaining $56,287.13 (i.e., $263,099.63 minus $206,812.50) was applied by the IRS against employee FICA withholding.

Romano-Murphy disagrees with the way in which the IRS applied the $189,316.63 of semiweekly deposits. She contends that the IRS should have applied the entire $189,316.63 amount against trust-fund taxes. In particular, she contends that $5,093.56 of the $189,316.63 should have been applied against employee FICA withholding and $184,223.07 of the $189,316.63 should have been applied against income-tax withholding.

Romano-Murphy argues that the application she urges is correct because, she says, NPRN directed the IRS to apply the deposits for the quarter against the trust-fund portion of the taxes first. She contends that Rev. Proc. 2002-26, sec. 3.01, 2002-1 C.B. 746, required the IRS to apply the payments in accordance with NPRN's directions.

**[*73]** In response, the IRS makes three arguments. It first argues:

> There are no means by which a tax deposit made via the EFTPS can be designated between a company's non-trust fund and trust fund payroll tax liabilities. Babcock v. United States, No. CV 08-08467, Amended Order Granting Motion for Summary Judgment in Favor of the U.S. at 3, (C.D. Cal. December 22, 2009). Providing taxpayers the ability to designate employment taxes in this manner would permissibly shift loss to the Government and implicitly disregard I.R.C. § 6672. Babcock, No. CV 08-08467 at 12-13.

Second, the IRS contends that Rev. Proc. 2002-26, supra, does not govern the application of the deposits because, it says, Rev. Proc. 2002-26, supra, allows a taxpayer to direct the application of payments only, not deposits. Third, the IRS argues that Rev. Proc. 2002-26, supra, is not controlling because, even if NPRN could have directed the application of the deposits, NPRN made no "specific written directions" with respect to the $189,316.63 of semiweekly deposits. See Rev. Proc. 2002-26, sec. 3.01 (IRS will apply payment in accordance with taxpayer's "specific written directions as to the application of the payment").

We agree with the IRS's third argument. As we explain, we do not believe that NPRN gave the IRS any directions--written or otherwise--regarding how to apply the semiweekly deposits to trust-fund taxes. We do not address the IRS's first and second arguments, except that we conclude that a taxpayer cannot in practice instruct the IRS through EFTPS or EFTPS-OnLine to apply

**[\*74]** employment-tax deposits to trust-fund taxes.  This finding is a partial adoption

of the IRS's first argument.  In arriving at the conclusion that NPRN did not give the

IRS any directions regarding how to apply the semiweekly deposits to trust-fund

taxes, we resolve a series of subsidiary factual disputes between the parties about

the alleged directions.  The parties' views on these subsidiary factual issues are

reproduced verbatim in the chart below:

| Findings of fact proposed in Romano-Murphy's brief filed Feb. 16, 2011 | IRS's answering brief filed Apr. 22, 2011 | Romano-Murphy's reply brief filed June 1, 2011 |
|---|---|---|
| 13.  Tax deposits were made through the Internal Revenue Service's EFTPS online system as required. | 13.  Respondent objects to the proposed finding of fact as it is uncorroborated and not supported by the evidence.  (Entire Record).  Petitioner failed to provide any documentation to show that NPRN made tax deposits using the Electronic Federal Tax Payment System ("EFTPS").  (Entire Record). | 13.  Petitioner objects to Respondent's objection as documentary evidence shows that Petitioner used the Electronic Federal Tax Payment System ("EFTPS") (Ex. 9-J, p. 10, 15). |
| 14.  The EFTPS system allows taxpayers to either pay a lump sum or designate payment to Withholding, Social Security and/or Medicare taxes. | 14.  Respondent objects to the proposed finding of fact as it is inaccurate and there is no evidence of record to support the finding. (Entire Record). | 14.  No objection. |
| 15.  Via the EFTPS system, Nurses PRN, LLC instructed that the partial tax deposits made in the 2005/06 tax period be applied to Withholding taxes, which are 100% trust fund taxes. | 15.  Respondent objects to the proposed finding of fact as it is uncorroborated and not supported by the evidence.  (Entire Record).  Petitioner failed to provide any documentation to show that NPRN made tax deposits using the EFTPS and designated deposits to withholding taxes.  (Entire Record). | 15.  Petitioner objects to Respondent's objection as evidence of payments are documented on a company payroll record (Ex. 34-P). |

[*75] One dispute between the parties is whether NPRN made its federal tax deposits through EFTPS. It is through that system, Romano-Murphy contends, that NPRN delivered its instruction to the IRS that its deposits should be applied against the trust-fund taxes first.

In considering whether NPRN made federal tax deposits through the electronic federal tax payment system, we first consider whether NPRN was required to do so. This is a relevant question because a taxpayer who is required to participate in EFTPS might be more likely to do so than one motivated only by practical considerations. In addition, the parties have raised the question of whether NPRN was required to make deposits electronically. Romano-Murphy's brief makes the assertion that "Tax deposits were made through the Internal Revenue Service's EFTPS online system as required." (Emphasis added.) Because EFTPS-OnLine is a version of EFTPS, her assertion implies that NPRN was required to use EFTPS to make its federal tax deposits. In response to her assertion, the IRS generally "objects to the proposed finding of fact as it is uncorroborated and not supported by the evidence." NPRN's deposits of employment taxes alone--without considering other types of taxes--were greater than $200,000 in 2004. Unless specifically exempted, taxpayers who deposit more than $200,000 in employment and certain other taxes are required to use electronic

**[\*76]** funds transfer to deposit those taxes.  <u>See</u> 26 C.F.R. sec. 31.6302-1(h)(2)(ii)(2005).  There is no evidence in the record that NPRN was specially exempted from the electronic-funds-transfer requirement.  The only authorized means of making electronic funds transfers is through EFTPS.  <u>See</u> Rev. Proc. 97-33, sec. 2.02.  Therefore we conclude that NPRN was required to use EFTPS to make its deposits of federal taxes.

We also conclude that NPRN actually used EFTPS to make its deposits of employment taxes.  As Romano-Murphy points out, a letter from the IRS to NPRN dated August 9, 2004, contains a list of all of NPRN's employment-tax deposits for the first quarter of 2004.  The list contains a notation, corresponding to each deposit, under the heading "Pymt Type".  For all deposits this notation is "EFT", except for two deposits for which the notation is "PMT".  The abbreviation EFT is an acronym for electronic funds transfer.  There is also an October 4, 2004 letter from the IRS to NPRN containing a list of all deposits of employment taxes for the second quarter of 2004.  The list also contains an entry for each deposit under the heading "PYMT TYPE".  For all deposits, this entry is "EFT".  Although the August 9 and October 4, 2004 IRS letters describe deposits made in 2004, not the second quarter of 2005, the record does not suggest that NPRN changed its method of making deposits between 2004 and 2005.  NPRN's Suntrust bank

**[*77]** statements also support the notion that NPRN made its deposits by electronic

funds transfers during the second quarter of 2005. A Suntrust bank statement shows

that on April 5, 2005, $16,944.21 was debited from NPRN's bank account. The

transaction was described as "ELECTRONIC":

ELECTRONIC/ACH DEBIT
    IRS                      USATAXPYMT   270509500721362

Including the $16,944.21 debit, there are 16 similar entries during the three months

of April, May, and June 2005:

| Date | Amount of Payment |
| --- | --- |
| Apr. 5 | $16,944.21 |
| Apr. 7 | 29,363.00 |
| Apr. 12 | 29,408.78 |
| Apr. 18 | 9,001.18 |
| Apr. 21 | 40,153.02 |
| Apr. 29 | 7,842.37 |
| May 3 | 16,675.97 |
| May 11 | 19,078.28 |
| May 24 | 15,678.00 |
| May 27 | 10,000.00 |
| June 1 | 29,186.26 |
| June 3 | 15,832.57 |
| June 14 | 13,531.67 |

| [*78] June 15 | 20,000.00 |
|---|---|
| June 21 | 13,337.99 |
| June 29 | 28,153.52 |

The notations in the two IRS letters and the Suntrust bank statement suggest that NPRN was making its deposits by electronic funds transfers. Although not all electronic transfers must be made through EFTPS, see IRS Information Release 2004-52, 2004 IRB LEXIS 166, at *1, we believe that it is more likely than not that NPRN made its deposits through EFTPS. We agree with Romano-Murphy that NPRN made its employment-tax deposits for the second quarter of 2005 through EFTPS.

Romano-Murphy contends that NPRN was required to use EFTPS-OnLine to make its federal tax deposits and that NPRN actually did use this system. Romano-Murphy cites no authority for the proposition that NPRN was required to use EFTPS-OnLine. Aside from Romano-Murphy's testimony, there is no proof in the record that NPRN actually used EFTPS-OnLine. The lack of corroborating evidence is peculiar. We reject her contentions that NPRN was required to use EFTPS-OnLine and that NPRN actually used it.

We next address the question of whether EFTPS in practice permitted taxpayers to direct the IRS to apply their employment-tax deposits to trust-fund

**[\*79]** taxes (i.e., employee FICA withholding and income-tax withholding) instead of the employer share of FICA. Although Romano-Murphy testified that the system permitted such directions, her testimony is uncorroborated. There is little in the trial record on the mechanics of EFTPS. We find, on the basis of the record, that EFTPS did not in practice permit taxpayers to direct their deposits toward trust-fund taxes.

We next consider whether NPRN directed the IRS through EFTPS to apply its employment-tax deposits for the second quarter of 2005 against trust-fund taxes. As noted above, we find that the system does not in practice permit a taxpayer to direct the IRS to apply deposits to trust-fund taxes. This is sufficient by itself to end the inquiry. If no such directions can be made using the system, then no directions could have been provided through the system. As proof that NPRN directed the IRS to apply its deposits against trust-fund taxes, Romano-Murphy points to a spreadsheet that was marked for identification as Exhibit 34-P. The spreadsheet reflects that NPRN made $189,316.63 of employment-tax deposits for the second quarter of 2005; on the spreadsheet, this amount is all allocated to trust-fund taxes. Romano-Murphy contends that the spreadsheet demonstrates that directions that were given by NPRN to the IRS that the amounts should be applied as they were allocated on the spreadsheet, i.e., against trust-fund

[*80] taxes. However, the stipulation describes the spreadsheet only as a document reflecting Romano-Murphy's allegations. It says: "Petitioner provided a schedule of alleged payments of employment taxes for the 2005/06 tax period attached as Exhibit 34-P." Although Romano-Murphy testified that the spreadsheet was a payroll record, nothing in the record establishes that the document was given to the IRS contemporaneously with the deposits. And nothing in the record establishes that the document reflects directions actually given to the IRS. Under the circumstances, we do not believe that Exhibit 34-P reflects directions to the IRS to apply NPRN's employment-tax deposits against trust-fund taxes.

Romano-Murphy contends that NPRN gave the alleged directions to the IRS through EFTPS. She does not allege, and we do not consider, whether NPRN gave the alleged directions through some other means, such as a letter or telephone call.

We find as a matter of fact that NPRN did not give directions through EFTPS that its employment-tax deposits were to be applied against trust-fund taxes. Thus, the IRS was not required to apply the deposits against trust-fund taxes.

**[\*81]**  B.     Application of the $73,783.00 Payment

Of the $1.6 million payment made to the IRS, $73,783.00 was applied by the IRS against NPRN's employment-tax liability for the second quarter of 2005.  The IRS combined the $189,316.63 in semiweekly deposits for that quarter and the $73,783.00 payment and applied that amount first against the employer share of FICA tax, eliminating the entire $206,812.50 employer share of FICA tax liability.  The IRS applied the remainder, $56,287.13, against employee FICA withholding.  Romano-Murphy contends that the entire $73,783.00 amount should have been applied against NPRN's trust-fund tax liability for the second quarter of 2005.  She contends that NPRN directed the IRS that the $73,783.00 payment should be applied against the trust-fund portion of the taxes first.  She contends that under Rev. Proc. 2002-26, sec. 3.01, the IRS was required to apply the payments in accordance with NPRN's instructions.

In response the IRS contends that a taxpayer cannot direct that a payment be applied against a payment of a particular tax under Rev. Proc. 2002-26, supra, unless the payment is made after assessment of the particular tax.  The IRS asserts that the $73,783.00 payment was made on July 1, 2005 and that the second-quarter 2005 employment taxes were assessed after the date of the payment, on July 31,

**[*82]** 2005. We need not reach the merits of this argument because, as we explain, we find that NPRN gave no directions with respect to the $73,783.00 payment.

Romano-Murphy argues that the asset-purchase agreement constitutes such a direction. We disagree for five reasons. First, the asset-purchase agreement is a private agreement among NPRN, MSSI, and NAC. Second, the provision of the agreement relating to the use of the $1.6 million is directed at these private parties, not the IRS. The provision states that NAC "shall pay" NPRN $1.6 million, "which shall be used to pay or satisfy its outstanding Tax Liabilities (as defined below) and, at the direction of the Members, shall be paid directly to" the IRS. The provision thus governs how the money was to be "used" by NPRN and NAC, not the IRS. Third, although Romano-Murphy contends that the IRS had a copy of the asset-purchase agreement when it applied the $73,783.00 payment, mere possession of the agreement by the IRS does not turn this agreement into a direction to the IRS. In any event, the record does not support the proposition that the IRS had a copy of the agreement. Fourth, even if the provision could be considered a direction to the IRS, the provision requires only that the payment be applied against employment-tax liability (and perhaps interest and penalties). It does not require that the payment be applied against trust-fund taxes, i.e.,

[*83] employee FICA withholding and income-tax withholding. Fifth, even if the provision directed that payments be applied against trust-fund taxes, it is not apparent that the second quarter of 2005 is one of the quarters toward which the payment must be directed. The phrase "Tax Liabilities" is defined in the asset-purchase agreement as "unsatisfied federal employment taxes for purposes of Form 941, and all interest and penalties thereto for periods prior to June 16, 2005." If the phrase "for periods prior to June 16, 2005" modifies "unsatisfied federal employment taxes" and not just "all interest and penalties thereto", then the second quarter of 2005 is excluded from "Tax Liabilities". In the stipulation of facts the parties agree that the second quarter of 2005 is excluded from the scope of "Tax Liabilities", as defined in the asset-purchase agreement. This resolves any ambiguity regarding the quarters included in "Tax Liabilities" and undercuts Romano-Murphy's contention that the asset-purchase agreement constituted a direction to the IRS that the $1.6 million payment be allocated to the trust-fund taxes for the second quarter of 2005. In summary, we find that the asset-purchase agreement was not a direction to the IRS to apply the $73,783.00 payment against NPRN's trust-fund taxes for the second quarter of 2005.

Romano-Murphy also argues that NPRN's lawyer wrote a letter to IRS Revenue Officer Greene directing that any payments out of the $1.6 million should

**[*84]** be applied toward trust-fund taxes. See supra part 14. However, the letter is not in the record. Id. Any direction governing the application of the $1.6 million payment would have had to be fairly complicated given that NPRN and the IRS had another agreement with respect to the application of the $1.6 million. See supra part 13. This other agreement is described in the stipulation as follows:

> NPRN and the Internal Revenue Service reached an agreement wherein the $1.6 million paid pursuant to the Asset Purchase Agreement was applied to the employment tax liabilities of NPRN for the periods ended March 31, 2004 and June 30, 2004 [i.e., the first and second quarters of 2004].

The alleged letter to Greene would necessarily have had to be coordinated with the agreement described in the stipulation. Another reason the letter would have needed to be detailed is that it supposedly directed the payment of $1.6 million to various types of tax liabilities for various tax periods. Romano-Murphy explained none of these details in her testimony about the letter. See supra part 14. Without more specific proof, we are reluctant to assume the existence of a letter directing the IRS to apply the $73,783.00 amount against the trust-fund liabilities for the second quarter of 2005. We believe that Romano-Murphy is mistaken about the content of the letter.

The IRS's records describe $740,712.89 of the $1.6 million payment as a trust-fund payment applied against the first quarter of 2004, and $785,504.11 of

[*85] the $1.6 million payment as a <u>trust-fund</u> payment applied against the second quarter of 2004. <u>See</u> <u>supra</u> part 15. Neither party suggests that this notation bears on the question of whether NPRN submitted directions to the IRS to apply a portion of the $1.6 million payment against the trust-fund taxes for the second quarter of 2005. We ourselves draw no such conclusion.

We find that NPRN did not direct the IRS to apply the $73,783.00 payment against the trust-fund portion of NPRN's employment-tax liability for the second quarter of 2005.

B.      Application of the Supposed $17,866.99 Overpayment From
        First Quarter 2004

Romano-Murphy argues that NPRN's unpaid employment-tax liability for the first quarter of 2004 was only $722,845.90 when the IRS applied $740,712.89 of the $1.6 million payment against NPRN's employment-tax liabilities for that quarter, resulting in an overpayment of $17,866.99 for the quarter. She argues that the IRS should have applied the alleged $17,866.99 overpayment against the second quarter 2005 trust-fund taxes. As we have found, however, there was no overpayment for the first quarter of 2004. <u>See</u> <u>supra</u> part 16.

**[\*86]** D. The $70,000 in Payments by NOC That Were Applied by the IRS Against Tax Liabilities for Fourth Quarter 2003, First Quarter 2004, and Second Quarter 2004

NOC made $70,000 in payments that the IRS applied against NPRN's employment taxes (or related interest or penalties) for the fourth quarter of 2003, the first quarter of 2004, and the second quarter of 2004. See supra part 20. Romano-Murphy argues that by the time of the payments, the IRS had already compromised or settled NPRN's employment-tax liabilities for these three quarters. Therefore, she argues the IRS should have applied the $70,000 in payments against NPRN's trust-fund taxes for the second quarter of 2005. As we have discussed, the record contains no evidence that the IRS compromised NPRN's tax liabilities for these three quarters. See supra part 13. We therefore reject Romano-Murphy's argument that the IRS should have applied the $70,000 in payments against NPRN's trust-fund taxes for the second quarter of 2005.

E. Alleged Overpayments of $12,009.07 From Fourth Quarter 2003, Fourth Quarter 2004, and First Quarter 2005

Romano-Murphy argues that NPRN overpaid its tax liabilities for the fourth quarter of 2003, the fourth quarter of 2004, and the first quarter of 2005. As we have found, there were no overpayments for these three quarters. See supra part 3 (fourth quarter 2003 and fourth quarter 2004), part 8 (first quarter 2005). We

[*87] therefore reject Romano-Murphy's argument that overpayments from these quarters should be applied against NPRN's employment-tax liability for the second quarter of 2005.

III.    Romano-Murphy Is a Responsible Person Under Section 6672

A responsible person is "Any person required to collect, truthfully account for, and pay over" taxes such as trust-fund taxes.  Sec. 6672(a); Thibodeau v. United States, 828 F.2d 1499, 1503 (11th Cir. 1987).  Whether a person is a responsible person is a "matter of status, duty and authority, not knowledge." Thibodeau, 828 F.2d at 1503.  Indicators that a person is a responsible person include "the holding of corporate office, control over financial affairs, the authority to disburse corporate funds, stock ownership, and the ability to hire and fire employees."  Id.

Romano-Murphy was the chief operating officer of NPRN.  She was in charge of NPRN's finances.  She wrote checks to NPRN's creditors.  She was therefore a responsible person under section 6672.

Romano-Murphy claims that she did not control NPRN's finances, and was therefore not a responsible person, because she owned only a 25% interest in NPRN.  But her ownership percentage is not dispositive.  In Thibodeau, 828 F.2d at 1504, the corporation's president was held to be a responsible person even

**[\*88]** though 100% of the stock of the corporation was owned by someone else and the president effectively reported to that stockholder.

Romano-Murphy also argues that she was not a "responsible person" because, she claims, most checks were signed with a facsimile of her signature by lower-level managers. But some of the checks were signed by Romano-Murphy personally. See Liddon v. United States, 448 F.2d 509, 513 (5th Cir. 1971) (former Fifth Circuit held that a corporate officer could be found to be a responsible person even though he was one of two corporate agents at the corporation's home office who could sign checks); Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (Eleventh Circuit adopted as binding all decisions of the former Fifth Circuit issued on September 30, 1981 and earlier). And if she was displeased with the way in which the lower-level managers were issuing the other checks, she could have withdrawn their check-writing authority. See Mazo v. United States, 591 F.2d 1151, 1156 (5th Cir. 1979) (former Fifth Circuit held that one of the managers of a corporation was a responsible person because he could have refrained from signing payroll checks until the IRS was paid and he could have directed the controller to make the payments to the IRS).

Romano-Murphy also claims that she did not have authority to permit NPRN to pay its trust-fund taxes because paying the taxes would have caused

[*89] NPRN to go out of business. She claims that the failure of NPRN to continue to operate would have placed NPRN in violation of its letter of intent with MSSI and its asset-purchase agreement with MSSI and NAC, and that such violations would have prevented it from finalizing the asset sale that resulted in the $1.6 million payment of its employment-tax liability. In effect, Romano-Murphy is arguing that NPRN had to default on its trust-fund taxes in the short term in order to pay them in the long term. Courts have rejected such arguments in the context of determining whether a responsible person acted willfully in refusing to pay over trust-fund taxes to the United States. See, e.g., Thibodeau, 828 F.2d at 1506; Davis v. United States, 961 F.2d 867, 871 (9th Cir. 1992) (responsible person argued that he did not act willfully because he "deferred payments to the IRS in an attempt to resuscitate * * * [the corporation] and thereby maximize the chances that the taxes would be repaid in full over time"). We do not adopt the argument in this context of determining whether Romano-Murphy is a responsible person. Nor do we accept Romano-Murphy's underlying premise that payment of the trust-fund taxes would have breached NPRN's obligations to MSSI. First, we consider the letter of intent, which was signed on December 6, 2004. See supra part 6. The terms of the letter of intent are not in the record, but even if its terms are identical to the terms of the November 18, 2004

**[\*90]** draft letter of intent (which is in the record), its provisions would not have required NPRN to default on its trust-fund obligations. Romano-Murphy relies on paragraph 10 of the November 18, 2004 draft letter of intent. This paragraph required NPRN to operate its business "in the normal course consistent with past practices, including with respect to cash management practices". To construe paragraph 10 to have required NPRN to use the trust fund for its own benefit would conflict with paragraph 5, which required NPRN to pay all of its taxes as a condition of closing. Paragraph 10 cannot reasonably be so construed. As for the asset-purchase agreement, no provisions in the agreement required NPRN to default on its federal trust-fund taxes. See supra part 11. Regardless, a contractual provision that required a party to violate federal tax laws would be void whether found in the letter of intent or the asset-purchase agreement. See McBrearty v. United States Taxpayers Union, 668 F.2d 450, 451 (8th Cir. 1982).

Romano-Murphy also argues that Rev. Rul. 2004-41, 2004-1 C.B. 845, bars the IRS from asserting that she owes the trust-fund-recovery penalty. The revenue ruling states: "If under state law the members of the LLC are not liable for the debts of the LLC, then absent fraudulent transfers or other special circumstances, the IRS may not collect the LLC's employment tax liability from the members, including by levy on the property and rights to property of the members." Id.

**[*91]** 2004-1 C.B. at 846. But the revenue ruling also states that "depending on the facts of a particular case, a member may be liable for the trust-fund recovery penalty under I.R.C. § 6672." Id. Here, the IRS is not attempting to collect NPRN's employment taxes from Romano-Murphy in her capacity as a member of NPRN. Rather, it is attempting to collect the trust-fund-recovery penalty because it alleges that she is a responsible officer. This theory of liability is consistent with Rev. Rul. 2004-41, supra.

IV.    Willfulness

    A.    Romano-Murphy Acted Willfully in Refusing To Pay Trust-Fund Taxes to the Federal Government

Romano-Murphy argues that she is not liable for the section 6672 penalty because she did not act willfully in failing to pay over the trust-fund taxes.

Once a person is demonstrated to be a "responsible person", the burden is on that person to disprove willfulness. Malloy v. United States, 17 F.3d 329, 331 (11th Cir. 1994). A responsible person acts willfully if he or she "has knowledge of payments to other creditors" after becoming "aware of the failure to remit the withheld taxes." Thosteson v. United States, 331 F.3d 1294, 1300 (11th Cir. 2003).

**[\*92]** There are a variety of times during and after a quarter when a payment to a creditor and a failure to remit taxes can establish that the responsible officer acted willfully.  For example:

- When wages are being paid.  See Newsome v. United States, 431 F.2d 742, 746 (5th Cir. 1970) ("[A] corporate officer or agent has a duty to see that withheld funds are properly collected from the employees, are maintained during the quarter, and are paid over to the government at the end of the quarter.  This duty, for purposes of section 6672 liability, is a continuing one <u>which arises when the federal income and social security taxes are withheld from employees' wages</u> and ends when such funds are paid over to the United States." (Emphasis added; fn. ref. omitted.)); Davis, 961 F.2d at 873 ("[L]iability as a responsible person attaches each time salaries are paid during the course of a quarter."); Juan F. Vasquez, Jr., & Peter A. Lowy, Responsible Person and Lender Liability for Trust Fund Taxes--Sections 6672 and 3505, 639-3rd Tax Management (BNA), sec. II.H.1, at A-28 ("Because  liability first attaches at the time wages are paid, not at some subsequent time when payment is due or the return is to be filed, responsibility can attach from the time of

**[*93]** withholding through the payment due date and beyond." (Fn. ref. omitted.)).

- When semiweekly deposits are due. <u>Brown v. United States</u>, 591 F.2d 1136, 1141 (5th Cir. 1979) ("However, as we have already pointed out, Treasury regulations require withheld funds to be deposited during the quarter and do not merely impose a duty to pay them at the end of the period. * * * [The corporate officer's] failure to make the withholding deposits required was itself 'willful.'").

- When the quarterly employment-tax payment is due. <u>See id.</u> at 1140-1142 (corporate officer took exclusive control over Sibwin, Inc.'s affairs on April 10, 1972; the court held that even if he was not a responsible officer when trust-fund taxes had been collected from the employees' wages during the first quarter of 1972, he was a responsible officer when payments of the trust-fund taxes became due on April 30, 1972; therefore the court held that he had a duty to pay over the trust-fund taxes and was liable for the penalty because he willfully failed to do so).

- After the quarterly payment date. <u>See Newsome</u>, 431 F.2d at 745 ("In many of these cases, a responsible officer's 'willfulness' is

**[\*94]** established by the knowing preference of other corporate creditors over the United States <u>after</u> the due date for the corporation to remit the withheld taxes." (Fn. ref. omitted.)).

There is authority for the proposition that a failure to remit trust-fund taxes to the United States is not willful where the responsible person made a reasonable effort to remit the funds but was thwarted by circumstances outside that person's control. <u>Feist v. United States</u>, 607 F.2d 954, 961 (Ct. Cl. 1979); <u>Finley v. United States</u>, 123 F.3d 1342, 1348 (10th Cir. 1997) (en banc). This is referred to as the reasonable-cause defense. <u>Thosteson</u>, 331 F.3d at 1301. An example of the reasonable-cause defense is when a responsible person made arrangements to pay the trust-fund liability through a bank only to find that the bank kept the payment for its own use instead of turning the payment over to the IRS. <u>See</u> <u>Rykoff v. United States</u>, 40 F.3d 305, 306 (9th Cir. 1994). A limitation on the reasonable-cause defense is that the efforts of the responsible person to pay trust-fund taxes to the IRS are irrelevant if the person also decided to make payments to other creditors despite knowing that the trust-fund taxes had not been paid. <u>See</u> <u>Thosteson</u>, 331 F.3d at 1301 (stating without resolving whether the reasonable-cause defense exists under the law of the Eleventh Circuit, that such an exception is not applicable to a responsible person who "consciously decided to make

[*95] payments to creditors other than the government even though he knew that the withholding taxes had not been paid"); Feist, 607 F.2d at 961, 962 (reasonable-cause defense available only because corporate treasurer did not "prefer other creditors").

A successful attempt to pay trust-fund taxes can also affect a responsible person's liability for the trust-fund-recovery penalty. If the tax is actually paid, there is no liability. See Brown, 591 F.2d at 1141 (corporate officer's "use of the withholding trust funds for other purposes in the interim made him liable for a Section 6672 penalty if the tax was not in fact paid" (emphasis added)). However, there is a timing question: how late can the tax payment be for the responsible person to be relieved of liability? In Newsome, the former Fifth Circuit suggested that a payment made by the quarterly payment deadline--a month after the end of the quarter--could be sufficient to absolve the responsible person of liability. 431 F.2d at 746 ("Of course, the officer is only liable under 6672 if the corporation does not pay over the withheld taxes at the date prescribed in the regulations."). In this case, the IRS acknowledges that remittances made by the dates that the semiweekly deposits were due would have been sufficient to absolve Romano-Murphy of liability. The acknowledgment to which we refer is found on page 57 of the IRS's answering brief.

[*96] In summary:

- A responsible person who knows that other creditors are being paid while the trust-fund taxes have not been paid is subject to liability for the penalty. See Thosteson, 331 F.3d at 1300.

- There may be a "reasonable-cause defense" if the responsible person took reasonable efforts to make a payment to the United States and, because of circumstances outside the person's control, the payment was not made. See Feist, 607 F.2d at 961; Finley, 123 F.3d at 1348. However, reasonable efforts at payment are to no avail if the responsible person pays other creditors. See Thosteson, 331 F.3d at 1301.

- In any event, a successful attempt to pay the trust-fund taxes, if made soon enough, relieves the responsible person of liability under section 6672. Brown, 591 F.2d at 1141; Newsome, 431 F.2d at 746.

With these principles in mind, we find that Romano-Murphy knew that NPRN was using the taxes withheld from its employees' wages for corporate purposes instead of reserving them for payment of its trust-fund taxes. During the entire second quarter of 2005 (the quarter for which the trust-fund-recovery penalty was assessed), Romano-Murphy knew that the trust-fund taxes were not

**[\*97]** being remitted to the IRS by NPRN. During the entire quarter, she had the authority to remit the trust-fund taxes to the federal government, but she failed to do so. Instead, she wrote checks to other creditors (and supervised the writing of checks to other creditors).

Against this admitted failure, Romano-Murphy's essential point is that she made various efforts to cause a payment of the trust-fund taxes. As explained before, a responsible person is absolved of liability for the trust-fund-recovery penalty if the payments are actually made. But NPRN did not pay the trust-fund taxes in dispute. Under the reasonable-cause defense, reasonable efforts to pay trust-fund taxes may absolve the responsible officer of liability. But none of Romano-Murphy's alleged efforts to cause a payment on NPRN's behalf obviate that she authorized payments to creditors other than the United States and therefore willfully failed to pay the trust-fund taxes. See Thosteson, 331 F.2d at 1301. We could end our analysis of willfulness here. However, in the interest of completeness, we will explain infra part IV.B why none of the actions that Romano-Murphy says she took to make payment of the trust-fund taxes constituted reasonable efforts to pay them.

**[*98]** B. <u>Romano-Murphy Did Not Make Reasonable Efforts To Pay NPRN's Unpaid Trust-Fund Taxes</u>

Romano-Murphy contends that many of her actions constitute reasonable efforts to pay the trust-fund taxes within the context of the reasonable-cause defense.

1. <u>NPRN's June 2004 Temporary Merger With Nurses Staffing, LLC, and Its August 2004 Negotiations With PRN Health Services, Inc.</u>

In June 2004 NPRN temporarily merged its operations with Nurses Staffing, LLC. In August 2004, after this merger failed, the members of NPRN received an offer from a different company, PRN Health Services, Inc., to purchase a 60% interest in NPRN for $850,000. Romano-Murphy contends that she personally supported both the June 2004 temporary merger of NPRN with Nurses Staffing, LLC, and the August 2004 negotiations by NPRN's members with PRN Health Services, Inc. She argues that the success of either deal would have "eliminated the tax liability". In effect, Romano-Murphy is arguing that had NPRN successfully merged with either PRN Health Services, Inc., or Nurses Staffing, LLC, in 2004, the merged company would have been financially stable enough that by the second quarter of 2005 it would have been able to make full deposits of trust-fund taxes withheld from wages. We disagree. Arranging a merger with

**[*99]** another company--in the hopes that the merged company will later make trust-fund deposits during a future quarter--is not a reasonable effort to pay the trust-fund taxes for the future quarter.

2.      The Alleged Assumption by NAC of NPRN's Second
        Quarter 2005 Trust-Fund-Tax Liability

Romano-Murphy claims that NPRN's trust-fund-tax liability for the second quarter of 2005 was assumed by NAC in the asset-purchase agreement, and that she reasonably expected that NAC would pay the liability.  We disagree.

In support of her view that NPRN's trust-fund-tax liability for the second quarter of 2005 was assumed by NAC in the asset-purchase agreement, Romano-Murphy makes the following contentions:

> NOC [i.e., NAC] expressly assumed the outstanding trust fund portion of Federal taxes due as of date of closing of $174,300 [citing Schedule 1.4 of the asset-purchase agreement].
>
> Schedule 1.4 does not specifically label the assumed taxes as the trust fund portion.  However, in conjunction with Schedules 3.7 with label of "state taxes other than withholding" which includes the Internal Revenue Service in the listing * * * and Schedule 3.11 Taxes * * * which depicts total taxes owed at time of closing, correctly provides implicit assumption the taxes assumed in Schedule 1-4 are trust fund liabilities.

The IRS takes the position that "Assumed Liabilities" do not include the trust-fund-tax liabilities for the second quarter of 2005.  It reasons:

[*100] The asset purchase agreement does not assume NPRN's employment tax liabilities for the second quarter 2005. Section 1.4(a) of the Asset Purchase Agreement states that MSSI, the parent company of NOC, will assume certain liabilities specifically set forth in this Section, one of which are the "general payables specifically set forth in Schedule 1.4" of the Asset Purchase Agreement. Section 1.4(a) further states that all other liabilities, not stated as assumed liabilities in this Section, are excluded liabilities and remain the liabilities of NPRN. Schedule 1.4 titled "General Payables" sets out two categories, "Taxes" and "General Payables." * * * Dr. Sahay, the CEO of MSSI, the purchasing company, testified that MSSI did not assume the 2005 second quarter employment tax liability of NPRN. * * * It was not the intent of the purchaser to assume these liabilities. Only the "General Payables" which were specifically set forth on Schedule 1.4, excluding the section titled "Taxes" were assumed by MSSI. In addition, petitioner admitted that the Asset Purchase Agreement did not expressly provide for the purchaser to assume liability for unpaid employment taxes.

It is unnecessary for us to determine whether the asset-purchase agreement obligated NAC to assume NPRN's trust-fund-tax liability for the second quarter of 2005. Even if NAC (or MSSI) had assumed NPRN's trust-fund-tax liability, we do not believe that there was a reasonable expectation that NAC would pay the trust-fund taxes. As it turns out, NOC (i.e., NAC after it was renamed) made $70,000 in payments of NPRN's employment taxes (or related penalties or interest), but the payments did not fully satisfy the balances, and none of the payments were applied to the second quarter of 2005. We find that the failure of

[*101] NAC (subsequently renamed NOC) to pay NPRN's trust-fund taxes for the second quarter of 2005 was foreseeable by Romano-Murphy.

Romano-Murphy also argues that she personally ensured that the letter of intent signed by MSSI on December 6, 2004, contained a requirement that MSSI assume the liability for NPRN's trust-fund taxes. She implies that the terms of the letter of intent (a document that is not in the record) were similar to those of the draft letter of intent (a document that is in the record). Even if this is true, the draft letter of intent provided only that MSSI would assume "a liability on Nurses PRN balance sheet of no more than $220,000 related to current operations". See supra part 6. Another provision of the letter required NPRN to pay all of its past due tax liabilities. See supra part 6. That suggests that the $220,000 in assumed liabilities would not have included any tax liabilities.

We find that it was unreasonable for Romano-Murphy to think that NAC (later known as NOC) would pay NPRN's trust-fund taxes for the second quarter of 2005.

We have taken Romano-Murphy's argument about the alleged assumption by NAC of the second-quarter-2005 trust-fund taxes as an attempt to show that she did not act willfully. We do not understand her to be arguing that the assumption of liabilities by NAC actually operated to relieve her of her section-6672 liability.

[*102] Such an argument would be invalid. Under section 6672 Romano-Murphy is liable for a penalty, and that section provides no mechanism for her to shift her responsibility for the penalty to someone else. See Collins v. United States, 92-2 U.S. Tax Cas. (CCH) para. 50,351 (E.D. Mo. 1992); Markel v. United States, 70-2 U.S. Tax Cas. (CCH) para. 9702 (W.D. Tex. 1970).

> 3. Whether Romano-Murphy's Refusal To Pay the Trust-Fund Taxes Was Justified by the Subsequent Payment of $1.6 Million

Romano-Murphy next argues:

> Petitioner had reasonable cause to not fully pay the 2005/06 trust fund liabilities as they occurred as it would have resulted in a material change in the business of Nurses PRN, LLC [NPRN] and jeopardized the sale. Had a material change occurred, the Internal Revenue Service would not have received $1.6 million in sale proceeds to pay outstanding tax liabilities of Nurses PRN, LLC.

Romano-Murphy's argument presupposes that it is permissible for a responsible person to refuse to remit trust-fund taxes if it will allow the employer to remit the taxes later. We do not see a qualitative difference between Romano-Murphy's argument and the argument, rejected by the Court of Appeals for the Eleventh Circuit in Thibodeau, 828 F.2d at 1506, that the responsible officer had to use the trust-fund money to keep his company in business. The court stated: "The taxpayer argues that the checks [to creditors] he signed were necessary to keep the

[*103] corporation operating as a going concern, but the government cannot be made an unwilling partner in a business experiencing financial difficulties." Id. In any event, as discussed before, we do not think it was reasonable for Romano-Murphy to think that NAC (later known as NOC) would pay all of NPRN's overdue trust-fund taxes. Orchestrating the asset sale was not a reasonable effort to pay federal trust-fund taxes. Although as part of the asset sale $1.6 million was paid toward NPRN's employment-tax liabilities and although $73,783.00 of the $1.6 million payment was applied to NPRN's employment-tax liability for the second quarter of 2005, the question is whether Romano-Murphy had a reasonable assurance that the entire trust-fund liability for the second quarter of 2005 would be paid by NAC. We find she had no reasonable assurance.

4. Romano-Murphy's Efforts To Sell NOC's Assets in 2006

Romano-Murphy argues that in 2006 she backed negotiations to sell NOC's assets or to merge NOC with another company. She contends that these transactions would have resulted in the assumption or the payment of the trust-fund taxes still owing for the second quarter of 2005. These negotiations involved (1) a potential sale to Resolve Staffing, Inc., in July 2006, (2) a potential merger with RealTime Services, Inc./Day Holding, LLC, in August 2006, (3) a potential

**[*104]** sale to General Healthcare Resources, Inc., in September 2006, and (4) a potential sale to PRN Health Services, Inc., in November 2006.  Romano-Murphy contends that despite her personal backing for these proposals, they were all vetoed by others.

At most, Romano-Murphy was attempting to raise cash, which could be used to pay the IRS.  This is not the same as attempting to pay the IRS. These attempts were not reasonable efforts to pay the trust-fund taxes for the second quarter of 2005.

5.      Romano-Murphy's Filing of a Proof of Claim in the Bankruptcy of MSSI

Romano-Murphy claims that once MSSI went bankrupt, she acted on behalf of NPRN in litigating its rights against MSSI as MSSI's creditor.  She characterizes her activities as follows:  "protecting the trust fund via valid Proof of Claim in Federal Bankruptcy Court and personally defending claim in the State of Virginia." At most, Romano-Murphy's actions in bankruptcy and state court increased the probability that NPRN would receive a portion of the distribution of MSSI's assets. This, too, is not the same as attempting to pay the overdue trust-fund taxes to the IRS.

[*105] We find that Romano-Murphy's participation in bankruptcy and state court proceedings against MSSI was not a reasonable effort to remit the unpaid trust-fund taxes to the United States.

### 6.   Accurate Reporting and Cooperation With the IRS

Romano-Murphy argues that she accurately reported NPRN's tax liabilities and cooperated fully with the IRS. But Romano-Murphy's liability under section 6672 stems from her failure to pay NPRN's trust-fund-tax liability, not her failure to report it accurately. The accuracy of her reporting and her later cooperation with the IRS are irrelevant.

Incidentally, we note that Romano-Murphy has challenged the amount of the trust-fund-recovery penalty on the ground that NPRN made deposits and payments of trust-fund taxes that were not correctly applied by the IRS. We have resolved these challenges. Romano-Murphy does not appear to raise what would be a separate contention, that these deposits and payments constituted reasonable efforts to remit the trust-fund taxes for the second quarter of 2005. We find that it was not reasonable for Romano-Murphy to suppose that the deposits or payments would reduce the trust-fund-tax liability for the second quarter of 2005.

**[*106]** C.    Alleged Errors Made by the Appeals Office Regarding Willfulness

Romano-Murphy argues that the Appeals Office made two errors of fact in

determining that her actions were willful.  She contends that these errors of fact

constitute an abuse of discretion.

First, Romano-Murphy challenges the following statement by the Appeals

Office:

> You [Romano-Murphy] indicated that the tax should have been
> absorbed through the sale of Nurses PRN LLC [NPRN] to Nurses
> Onsite Corporation [NOC] thru an asset purchase agreement.
> However, the sale did not materialize and the buyer filed bankruptcy.
> * * *

Romano-Murphy observes that the sale of NPRN's assets to NAC did

"materialize".  The asset-purchase agreement was executed on June 16, 2005.  The

sale was completed on July 1, 2005.  It was not until December 27, 2006, that MSSI

and NAC (by then called NOC) filed for bankruptcy.  This was nearly 1-1/2 years

after the sale.

Second, Romano-Murphy argues that the Appeals Office erred in making the

following statement:

> [R]eview of records showed that the tax period in question was not
> part of the settlement you addressed in your issues of protest but rather
> had accrued subsequent to the settlement issue being raised.
> * * *

[*107] Romano-Murphy contends that this conclusion is wrong. She states:

> Petitioner sent letters and completed several forms to dispute the TFRP [trust-fund-recovery penalty] issued [sic] being raised, all of which protested the 2005/06 TFRP issue at hand and have no relevance to the $1.6 million cash consideration received from MSSI to pay outstanding tax liabilities as mistakenly stated in the Notice of Determination. [Record citations omitted.]

Because we accord no deference to the determination of the Appeals Office, see supra part I.A, it is not necessary to determine whether its reasoning was defective. We have drawn our own conclusions about whether Romano-Murphy is liable for a section 6672 penalty of $346,732.38. We determine that she is.

To reflect the foregoing,

Decision will be entered

for respondent.